# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### (HEARD AT DYERSBURG)

FOR PUBLICATION

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | **Filed: September 28, 1998** |
| | ) | |
| Appellee, | ) | SHELBY COUNTY |
| | ) | |
| v. | ) | Hon. Arthur T. Bennett, |
| | ) | Judge |
| CLARENCE C. NESBIT, | ) | |
| | ) | |
| Appellant, | ) | Supreme Court |
| | ) | No. 02-S01-9705-CR-00043 |

FILED

September 28, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

FOR APPELLANT:

A.C. Wharton
District Public Defender
201 Poplar Ave., Suite 201
Memphis, Tennessee

W. Mark Ward
Assistant Public Defender
147 Jefferson, Suite 900
Memphis, Tennessee
(Appeal Only)

Ronald S. Johnson
Betty J. Thomas
Assistant Public Defender
147 Jefferson, Suite 900
Memphis, Tennessee
(Trial Only)

FOR APPELLEE:

John Knox Walkup
    Attorney General & Reporter

Michael E. Moore
    Solicitor General

John P. Cauley
    Assistant Attorney General
    450 James Robertson Pkwy.
Nashville, Tennessee

William Gibbons
District Attorney General
30th Judicial District

Thomas D. Henderson
Jennifer Nichols
    Assistant District Attorneys General
    201 Poplar Avenue
    Memphis, Tennessee

# OPINION

TRIAL COURT AND
COURT OF CRIMINAL APPEALS AFFIRMED.          DROWOTA, J.

In this capital case, the defendant, Clarence C. Nesbit, was convicted of premeditated first degree murder. At the sentencing hearing, the jury found one aggravating circumstance: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (1991 Repl.). Finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution.

On direct appeal to the Court of Criminal Appeals, the defendant challenged both his conviction and sentence, raising eleven claims of error, some with numerous subparts. After fully considering the defendant's claims, the Court of Criminal Appeals affirmed the trial court's judgment. Thereafter, pursuant to Tenn. Code Ann. § 39-13-206(a)(1) (1997 Repl.),[1] the case was docketed in this Court.

---

[1] "Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

The defendant raised numerous issues in this Court, but after carefully examining the entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendant and the State, this Court, on September 30, 1997, entered an Order limiting oral argument to five issues, and setting the cause for oral argument at the April term of Court in Jackson.[2] See Tenn. S. Ct. R. 12.[3]

After hearing oral argument and carefully reviewing the record, we have determined that none of the assignments of error require reversal. Moreover, the evidence supports the jury's findings as to the aggravating and mitigating circumstances, and the sentence of death is not arbitrary or disproportionate to the sentence imposed in similar cases, considering the nature of the crime and the defendant. Accordingly, the judgment of the Court of Criminal Appeals upholding the defendant's conviction for first degree murder and sentence of death by electrocution is affirmed.

## FACTUAL BACKGROUND

It is undisputed that the nineteen-year-old defendant, Clarence Nesbit, killed the twenty-year-old victim, Miriam Cannon, by shooting her once in the head on the afternoon of May 20, 1993. While Nesbit admitted that he shot the victim, he claimed that the shooting had been an accident.

---

[2]Oral arguments were heard in this case on March 4, 1998, in Dyersburg, Dyer County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

[3]Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument."

The proof introduced at the guilt phase of this trial established that the victim lived with her five young children[4] at the Pershing Apartments in Memphis, Tennessee. She had known the defendant for approximately one month prior to her killing. The victim's sister, Constance Cannon, testified that around 1:00 p.m. on the day of the murder, she and a friend stopped by the victim's apartment to drive the victim to the grocery store. Although Cannon knocked at the door for several minutes, no one answered. As they were leaving, Cannon's friend noticed one of the victim's children looking out the window. By the time Cannon returned to the door, the victim had opened it. The victim told Cannon that she was not ready to go and asked Cannon to return at 3:00 p.m. Contrary to her usual practice, the victim did not ask Cannon to come inside. Nonetheless, from the back door, Cannon saw the defendant sitting on the living room couch with one of the victim's children. Cannon had seen the defendant once before the day of the murder, but knew him only by his nickname "Red." Cannon recalled that the victim had been barefoot on the day of the murder, although otherwise fully clothed. Cannon also recalled seeing a horizontal mark on the victim's neck that she had not seen the day before the murder. Cannon left, as the victim requested, but later telephoned the victim around 3:00 p.m. to confirm their plans. Upon receiving no answer, Cannon assumed the victim had made other arrangements and did not return to her sister's apartment.

James Shaw, a boyfriend of the defendant's aunt, lived in the victim's apartment complex. Shaw testified that he had been sitting outside his apartment on the afternoon of the murder when he heard a gunshot in a nearby apartment unit. Shortly afterward, Shaw saw the

---

[4]At the time of the trial in 1995, the ages of the victim's children ranged from three to seven years.

defendant leave the area from which the gunshot had sounded, casually walk to his car, a blue Oldsmobile, and drive away from the apartment complex at a normal rate of speed. Shaw described the defendant's behavior as normal, except for the "funny look" Shaw had observed in the defendant's eyes. Shortly after the defendant departed, Shaw saw the victim's children crying in the parking lot of the complex. When Shaw inquired about their mother, one of the children responded, "She's dead."

Tracy Davis, the victim's close friend and neighbor, testified that on the day of the murder she had heard children crying in the victim's apartment and had seen three of the victim's children walking toward her apartment. The children told Davis that their mother was asleep and could not be woken. As a result, Davis went to the victim's apartment and found the victim lying in a pool of blood in front of the kitchen door. The victim's youngest child was on the floor beside her mother trying to wake her. Davis returned to her apartment and called the police.

When the police arrived, they first spoke with the victim's children who told them that "Red" had shot their mother. "Red" was one of the defendant's nicknames. When the police entered the victim's apartment, they found her body lying face up, fully clothed, with sandals on her feet. Next to her body police found a cigarette butt, a match, a book of matches, and a hair barrette. Four cartridges were found on top of the refrigerator and a lead bullet fragment on the kitchen floor at the door to the living room. A hot curling iron lay on the kitchen counter. A ricochet mark made by a bullet was found approximately 4'8" above the ground on the wall behind the stove.

Dr. O. C. Smith, assistant medical examiner for Shelby County, performed the autopsy on the victim. Dr. Smith testified that the victim had died from a single gunshot wound to her head. Dr. Smith opined that the gun inflicting the wound had been approximately twelve to thirty-six inches from the victim's head when it was fired. The bullet entered the victim's body through her left ear, about 5'0" above the floor, traveled in a downward trajectory through the victim's skull and brain, and exited behind her right ear at a height of 4'11" above the floor. According to Dr. Smith, the gunshot wound would have instantly incapacitated the victim.

Dr. Smith also had observed burns on the victim's chin, neck, abdomen, and forearm. The burns had been inflicted at various points in time from six hours to mere minutes before the victim had died. Dr. Smith described the burn on the left side of the victim's neck as in the shape of the numeral one ("1"). Upon viewing photographs of the victim's body, Constance Cannon testified that the horizontal bar at the base of that burn appeared to be the mark she had seen on her sister's neck the afternoon of the murder. Dr. Smith testified that soot and blistering on another triangular burn under the victim's chin indicated that it had been caused by an open flame. Although the other burns had also been thermal in origin, Dr. Smith could not identify the precise cause of those burns.

Dr. Smith also found bruising and scraping on the soles of the victim's feet during the autopsy. He opined that these injuries had been caused by striking the victim's feet with a long, hard, thin object such as a rod or a coat hanger. Dr. Smith found no defensive wounds on the victim's body.

With respect to the defendant's actions on the day of the murder, the proof showed that, after the shooting, Nesbit left the Pershing Apartments and drove to the Royal Oaks Motel, where his uncle Ashley Nesbit, had a room. Once there, he spoke privately with his uncle, and hid the murder weapon, a .357 Magnum revolver, in the bathroom of the motel room. After the victim's body had been found the defendant returned to the Pershing Apartments in his cousin's green pickup truck. The defendant encountered James Shaw and told him that the victim had shot herself while playing Russian Roulette. Upon Shaw's advice to tell the truth, Nesbit admitted to Shaw that he shot the victim, but claimed it was an accident. The defendant also told Shaw that he had left the gun at the motel. Shaw and the defendant were preparing to drive out of the apartment complex to retrieve the gun when police stopped their vehicle and apprehended the defendant. A search of the defendant's person revealed a beeper and $602 in cash. With police permission Shaw proceeded to the motel, retrieved the gun, and surrendered it to police.

In the meantime, the defendant was interrogated by police and stated that he spent the night before the killing at the victim's apartment. At first, Nesbit told police that the victim had been "playing" with the gun when it discharged and killed her. Later, the defendant related that he accidentally shot the victim, claiming that he had pulled the trigger believing the gun to be unloaded.

At trial Nesbit testified that he had been visiting his uncle's motel room on the night before the killing when police officers arrived at the motel and began a search of the premises. Observing a gun on the dresser, Nesbit removed it from the room before the search and placed it under the seat of his car. After receiving a message from the victim on his beeper, Nesbit went to

her apartment, arriving at approximately 3:00 a.m. Nesbit carried the gun inside, removed the bullets, and placed them on top of the refrigerator. He and the victim talked for awhile before he fell asleep on the living room sofa. Nesbit awoke at 10:00 a.m. on the day of the murder and talked to the victim until her sister arrived at 1:00 p.m. Nesbit heard the victim tell her sister to come back at 3:00 p.m. and was preparing to leave in anticipation of Cannon's arrival when the shooting occurred.

According to Nesbit, he had retrieved the gun from the refrigerator and was holding it as he looked outside through the blinds covering the window next to the kitchen door. As he turned away from the window, he held the gun in both hands and pointed it sideways to his left. As he "fumbled" with the gun, it discharged. According to Nesbit, the victim, who was standing to his left, was hit by the bullet when the pistol accidentally discharged. The defendant said that he panicked and left the apartment. Nesbit admitted that his route of departure through the front door had taken him past the victim's dead body and allowed him to retrieve his cap from the sofa. Nesbit did not call for emergency assistance even though he knew that he was leaving four young children in an apartment with their mother's dead body. The defendant denied inflicting the burn and bruise injuries upon the victim.

On cross-examination, the State attempted to emphasize the inconsistencies between Nesbit's several pretrial statements and his trial testimony. The State also elicited an admission from Nesbit that he had been alone with the victim and her children on the day of the murder. Based upon the proof summarized above, the jury found the defendant guilty of premeditated first degree murder. The trial proceeded to the sentencing phase.

The State relied upon the evidence presented during the guilt phase of the trial and, in addition, recalled Dr. Smith to testify about the burns and the bruises found on the victim's body. Dr. Smith again stated that these injuries were inflicted as long as six hours, or as little as mere minutes before the victim's death. He said the burns on the victim's body ranged from severe first degree to moderate second degree burns and were comparable to a severe sunburn or scald burns caused by touching something hot. Dr. Smith opined that the victim would have suffered "moderate" pain from the individual burns.

According to Dr. Smith, the scrapes and bruises found on the victim's feet were consistent with a relatively rare type of torture called "falanga," which involves forcefully striking the soles of a person's feet with a rod or some similar instrument, and which typically is inflicted in a military context, and, to a lesser extent, in child abuse cases. While none of these injuries were severe enough to require hospitalization, Dr. Smith said the amount of force necessary to cause bruising on the soles of a person's feet would cause "great pain," and if applied to any other part of the body, such force would be sufficient to break the skin. With respect to both the burns and the bruises, Dr. Smith testified that the victim would have suffered a great deal of distress anticipating the injuries since they had been inflicted over an extended period of time. Although Dr. Smith found no marks on the victim's body indicating that she had been restrained, he opined that soft ligatures would have left no marks. Additionally, he stated that the victim might have been restrained by mental intimidation. Dr. Smith found no defensive wounds on the victim's body and no signs of sexual assault or activity. Finally, the doctor opined that torture is not ordinarily inflicted to produce death.

The only other witness for the State was the victim's mother who described the impact of the victim's death on her family, including her parents and siblings and particularly the victim's children.

In mitigation, the defendant presented proof that he had participated in the Shelby County Jail choir. Nesbit's brother and sister asked the jury to spare the defendant's life and testified that he is a nice, kind brother who previously had given them good advice and helped them to correct mistakes they had made. The defendant's mother and grandmother testified Nesbit had been a good, kind, and well-behaved person. They described him as an honest and sincere young man who had always told the truth and followed the right path. Nesbit had dropped out of school in the tenth grade and moved to Nashville to care for his grandmother who had been experiencing health problems. While there, he had obtained several jobs to assist his grandmother in meeting her financial obligations. Both the defendant's mother and grandmother asked the jury to spare the defendant's life.

Testifying in his own behalf, Nesbit, nineteen-years old when the offense had been committed, told the jury of his plans to improve himself and expressed remorse for what had happened. While the defendant admitted to having a juvenile record for trespass, driving on a revoked license, and assault, he explained the circumstances of those convictions and minimized his criminal culpability for each one. The defendant had no adult criminal record. Nesbit also related that he had dropped out of school in the tenth grade to care for his grandmother who lived in Nashville. Nesbit had not been steadily employed at the time of the killing, but he explained that the $602 cash found on his person when he had been arrested consisted of money he had

saved or had been given.

Based upon the proof, the jury found that the State had proven the existence of the aggravating circumstance beyond a reasonable doubt: (1) "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (1991 Repl.). Finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors assigned by the defendant, we affirm the judgment of the trial court and the judgment of the Court of Criminal Appeals.

## **WAIVER**

As in the Court of Criminal Appeals, the State in this Court first argues that the defendant's failure to timely file his motion for new trial precludes appellate review of all issues except those related to the sufficiency of the evidence or sentencing. We disagree.

The State is correct that in this case the motion for new trial was filed beyond the thirty-day period provided by Rule 33(b), Tenn.R.Crim.P. The motion was indeed late and, in a non-capital case, appellate review would be limited. See Tenn. R. App. P. 3(e); State v. Givhan, 616 S.W.2d 612, 613-614 (Tenn. Crim.App. 1980). However, both the Court of Criminal Appeals and this Court have a statutory obligation under Tenn. Code Ann. § 39-13-206 (1997 Repl.) to review the defendant's conviction of first degree murder and sentence of death. Moreover, our

statutory duty to review the sentence of death exists even in the absence of an appeal by the defendant.[5]  In light of this clear statutory directive, it would be anomalous, in our view, to hold that review is precluded because the motion for new trial was not timely filed.  By so holding, we do not by any means approve or suggest that attorneys in capital cases make a practice of late filing the defendant's motion for a new trial.  To the contrary, attorneys representing capital defendants should diligently comply with all filing deadlines.  Indeed, the failure to do so in some circumstances could support a claim of ineffective assistance of counsel.  We simply hold that in light of our statutory duty to review capital cases, this Court has jurisdiction to review the issues raised in this appeal despite the defendant's failure to timely file his motion for new trial. Cf.  State v. Bigbee, 885 S.W.2d 797, 805 (Tenn. 1994); State v. Martin, 702 S.W.2d 560, 564 (Tenn. 1985); State v. Duncan, 698 S.W.2d 63, 67-68 (Tenn. 1985); State v. Strouth, 620 S.W.2d 467, 471 (Tenn. 1981).

## IMPEACHMENT OF CHARACTER WITNESS - RULE 405

The defendant next contends that the trial court erroneously permitted the State to examine a character witness about his knowledge of the defendant's alleged satanic beliefs and practices.  Specifically, the defendant asserts that  no reasonable factual basis for the specific instance of conduct existed because the alleged rumor surfaced after the killing, the questioning did not properly address the credibility of the witness's testimony, and the probative value of the inquiry did not outweigh its prejudicial effect.  The State responds that the inquiry was proper

---

[5]"If the defendant has been convicted of first degree murder and sentenced to death but does not appeal the conviction of first degree murder, then the trial court shall certify, within ninety (90) days after the judgment has become final, the record relating to punishment and the same shall be transmitted by the clerk of the trial court to the Court of Criminal Appeals. . . ."  Tenn. Code Ann. § 39-13-206 (1997 Repl.)

under applicable evidentiary standards.

Pursuant to Rule 405(a), Tenn. R. Evid., a witness offering testimony about the defendant's character may be impeached by questions which test the character witness's knowledge of "relevant specific instances of conduct."[6] The purposes served by such inquiries has been explained as follows:

> Specific instances of conduct are permissible on cross-examination for several reasons. First, they test the credibility of the character witness by providing information on the underlying data upon which the opinion or reputation was formed. If an opinion witness, who testifies that the defendant was an honest person at the critical time, did not know that the defendant had a prior embezzlement conviction, the opinion may have been formed on the basis of inadequate information or a careless (and therefore suspect) approach to assessing a person's reputation. Second, the specific acts help the trier of fact assess the standards used by the character witness. For example, if a witness who gave the opinion that the defendant is an honest person also knew that the defendant had ten shoplifting convictions, the trier of fact may choose to discount the opinion evidence because of the character witness's low standards for measuring honesty.

Cohen, Sheppeard, Paine, Tennessee Law of Evidence, § 405.3, p. 195 (3rd ed. 1995 & Supp. 1997) (hereinafter "Evidence, § __, p. __.").

---

[6]Rule 405(a) provides as follows:

In all cases in which evidence of character or a trait of character of a person is admissible, proof may be by testimony as to reputation or by testimony in the form of an opinion. After application to the court, inquiry on cross-examination is allowable into relevant specific instances of conduct. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:
(1) The court upon request must hold a hearing outside the jury's presence,
(2) The court must determine that a reasonable factual basis exists for the inquiry, and,
(3) The court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

Though inquiries into specific instances of conduct serve valid impeachment purposes, to prevent the jury from hearing inadmissible and potentially prejudicial allegations about the defendant's character, Rule 405 includes certain procedural prerequisites which must be satisfied before such inquiries are permissible. First, an attorney must make application to the court before utilizing a specific instance of conduct to impeach a character witness. Since the rule provides no time limit, application may be made immediately before the question is asked, but if opposing counsel is unable to respond because of surprise, a recess may be appropriate. Evidence, § 405.3, p. 197.

Second, Rule 405 mandates that the trial court, upon request, conduct a hearing outside the jury's presence to determine whether inquiries into specific instances of conduct are permissible. During this jury-out hearing, the trial court must determine whether the specific instance of conduct about which inquiry is proposed is relevant to the character trait about which the witness has testified. For example, this Court held in State v. Sims, 746 S.W.2d 191 (Tenn. 1988), that questions regarding the defendant's prior arrests for bad checks and shoplifting were permissible to impeach the character witness who had testified that the defendant had a good reputation for truthfulness in the community. However, we held impermissible questions regarding the defendant's prior arrests for assault and battery because they were not relevant to the character trait about which the witness had testified -- the defendant's truthfulness. Though the decision in Sims was rendered before the adoption of the Tennessee Rules of Evidence in 1990, it is an accurate interpretation of the language of Rule 405 which permits inquiries into "*relevant* specific instances of conduct." (Emphasis added.)

If the relevancy standard is satisfied, the trial court must next determine whether a "reasonable factual basis" exists for the specific instance of conduct. Rule 405 provides no specific guidance with respect to the nature of evidence or the showing required to establish the existence of a "reasonable factual basis." Nonetheless, we agree with the Court of Criminal Appeals that whenever possible, extrinsic proof should be offered at the jury-out hearing to establish the "reasonable factual basis." If the realities of trial make it impossible to do so, the attorney proposing to ask the question should, at a minimum, clearly state on the record the source and origin of the information underlying the specific instance of conduct about which inquiry is proposed. Evidence, § 405.3 at p. 197.

In evaluating whether a "reasonable factual basis" has been established, the trial court should be mindful that the purpose of this requirement, as noted by the Court of Criminal Appeals in this case, is to ensure that such questions are proposed in good faith, rather than in an effort to place before the jury unfairly prejudicial information supported only by unreliable rumors. Though we have not previously addressed the "reasonable factual basis" requirement of Rule 405, this Court, long ago, decided that reports of a defendant's bad character which do not arise until after the crime for which he or she is being tried are inherently suspect.

For example, in Powers v. State, 117 Tenn. 363, 97 S.W. 815, 817 (1906), during the defendant's trial for first degree murder for stabbing his school teacher to death, a witness for the prosecution testified on cross-examination as to the good character of the defendant. Purporting to test the witness's credibility, the prosecution, on redirect, asked the witness if he had heard that the defendant had "run his stepfather from home with a knife, and had threatened to kill

another school-teacher, and had lain in weight [sic] for him with a shotgun."  The witness

responded that he had heard these reports after the killing had occurred.  Powers was convicted,

and before this Court argued that reports of a defendant's alleged misconduct which arise after

the commission of the crime should not be used by the prosecution to impeach a character

witness.  This Court agreed with the defendant, stating:

> The reputation which a defendant has made upon the subject of quietness and
> good citizenship available for or against him in a criminal cause when he puts his
> character in issue is that which he bore at and before the taking place of the act for
> which he is upon trial, not a reputation subsequently acquired or created for or
> against him.  A different view would put a premium on the manufacturing of
> evidence.

Powers, 97 S.W. at 817.  This Court reversed the conviction because the "matter testified to came

to the knowledge of the witnesses after the commission of the homicide which was the subject of

investigation," and, therefore was not a subject upon which the character witness could be

impeached.  Id; see also Tucker v. State, 149 Tenn. 98, 257 S.W. 850, 856 (1924); Wanda E.

Wakefield, Annotation, "Cross-Examination of Character Witness," 13 A.L.R.4th 796,  § 8

(1982 & Supp. 1997) (citing cases limiting cross-examination to specific instances of conduct

which occurred before commission of the crime on trial).


        While our decisions in Powers and Tucker predate the adoption of the Tennessee Rules of

Evidence, the logic and rationale of those decisions are consistent with, and reflected by, the

"reasonable factual basis" requirement of Rule 405.  Because of the potential for evidence

manufacturing, and because a person accused of a crime is more likely to be the subject of rumor

and innuendo, reports of specific instances of conduct which do not arise until after a crime has

been committed are inherently suspect and may not form the basis for inquiry under Rule 405.  In

addition, a trial court should exercise caution in permitting inquiry under Rule 405 if the character witness subject to impeachment first heard reports of the specific instance of conduct after the crime occurred. Under those circumstances, to establish a reasonable factual basis, the prosecution must offer some proof at the jury-out hearing that the specific instance of conduct had been reported before the crime occurred.

If a specific instance of conduct is relevant and supported by a reasonable factual basis, the trial court must next determine whether the probative value of a "specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on the substantive issues." In recognition of the uniquely prejudicial impact of allegations of instances of bad conduct, the evidentiary rules place a tighter restraint on the permissibility of inquiries about relevant specific instances of conduct than is placed on the admissibility of other relevant evidence. Indeed, Rule 403, Tenn. R. Evid., provides that relevant evidence is excluded only if its probative value is "substantially outweighed" by its prejudicial effect. In contrast, inquiries into specific instances of conduct under Rule 405 are precluded if probative value and prejudicial effect are of equal weight, or if the prejudicial effect of the specific instance of conduct on substantive issues merely "outweighs" its probative impeachment value. See also Tenn. R. Evid. 404(b) (same weighing standard governs admission of proof of prior bad acts).

Even when a trial court determines that an inquiry is permissible under the previously delineated procedural safeguards of Rule 405, Tennessee law requires the trial court to instruct the jury that the specific acts of conduct were admitted for the limited purpose of evaluating the credibility of the character witness. Sims, supra.

Having set out the governing legal principles, we must now apply these rules to the facts of this case. Here, the alleged error arose during the guilt phase of the trial when defense counsel, at the end of his cross-examination of James Shaw, a witness for the State, asked Shaw if he was familiar with the defendant's reputation in the community for peacefulness and violence. Shaw, who had dated the defendant's aunt and known the defendant for twelve years, responded, "Yeah. He didn't bother nobody. You know, he'd help you if he could, but he never did - he never did bother nobody. He seemed like to me he always tried to stay away from, you know, trouble."

At the beginning of redirect, the prosecutor, during a bench conference, advised the trial court that to test Shaw's basis of knowledge the State proposed to ask Shaw whether he had heard that the defendant claimed he worshiped Satan and had to kill two people to get power. The defense requested a jury-out hearing, at which Shaw admitted that he had heard these allegations after the murder was committed from the defendant's "auntie and them," and again before trial from the prosecuting attorney. The prosecutor then remarked that he had heard this information "from two or three people as well" and argued that, with Shaw's having also heard it, a "factual basis" existed for asking the question. The prosecutor explained to the trial court that "Ms. Cannon [the victim] is the one who told several of them that the defendant told her that." Shaw then indicated that the defendant's aunt had heard the allegations of satanic worship from the victim's family after the murder. No other evidence concerning this allegation of satanic worship was offered. Based upon this information, the trial court allowed the inquiry. The following exchange occurred in the presence of the jury:

Prosecutor: In forming your opinion of his reputation in the community in which he works and lives for peacefulness and quietude, had you heard that the defendant had told others that he worshiped Satan and needed to kill two people in order to get some power?

Shaw: No, I had not heard that.

Prosecutor: You had not heard that?

Shaw: I had not heard that.

Prosecutor: Didn't you testify just a few moments ago out of the hearing of the jury that you had heard that from Cynthia Nesbit?

Shaw: Oh, yeah, but I thought you was talking about had I heard it from him.

Prosecutor: No, no. I'm not talking about that. Let me be careful. You've heard it from - - at least from Cynthia Nesbit; is that correct?

Shaw: Right.

Prosecutor: That's what he said; is that correct?

Shaw: No, I heard that that's what she had heard.

Prosecutor: And did you take that into account in forming your opinion of his reputation for peacefulness and quietude?

Shaw: What do you mean by that?

Prosecutor: Does that sound peaceful and quiet to you?

Shaw: Well, I still don't' understand what you are saying.

Prosecutor: If somebody said that they needed to kill two people to get power, would that sound peaceful and quiet to you?

Shaw: No, it wouldn't, but I ain't heard nothing from him like that.

Prosecutor: I understand. Thank you. No further questions, Your Honor.

JUDGE: Ladies and gentlemen, the Court charges the jury that if you find that specific instances of bad character of the defendant have been brought out in the trial, then you can consider it only for the purpose of testing the accuracy and credibility of the character witness, and that evidence thus developed is not substantive evidence of the defendant's good or bad character. All right. You may, if you have recross-examination.

Defense: What is your opinion of his peacefulness and quietude now? What is your opinion of him?

Shaw: Well, in my opinion, he's a nice young man. Like I said, you know, in my opinion, you know, he didn't bother nobody. Like I said, he always helped me. I go to him, tell him I need him to do some work for me; he do it, you know. He just the type he didn't, you know, he respected his aunties and things and everybody else, you know, his elders.

Defense: So you never heard this opinion directly from anybody? I mean, you don't know of your personal knowledge about anything of that; is that correct?

Shaw: No, I don't. No, I don't.

The final charge to the jury in this case repeated the admonition that "specific instances of bad character of the defendant" are only to be used to test the accuracy and credibility of the character witness and not as substantive evidence of the defendant's good or bad character.

In our view, the record in this case indicates that the requirements of Rule 405 were satisfied. The prosecutor sought the trial court's permission before questioning the character witness about the defendant's alleged satanic worship. At defense counsel's request, the trial court held a hearing outside the jury's presence to consider the issue. The specific instance of

conduct about which inquiry was proposed was relevant to the issue about which the witness had testified -- the defendant's reputation in the community for peacefulness and quietude. A reasonable factual basis was established. The prosecutor identified the source and origin of the specific instance of conduct on the record at the jury-out hearing. Though the character witness said he had not heard the allegations of satanic worship until after the murder, the prosecutor's statement identifying the victim of the murder as the source of the report obviously is some proof that the incident had been reported before the murder occurred. A review of the record does not demonstrate that the prejudicial effect of the specific instance of conduct on the substantive issues outweighed its probative impeachment value. The inquiry was directly relevant to the character traits of peacefulness and quietude about which the witness had testified. Immediately following the inquiry and again in its final charge, the trial court properly instructed the jury as to the permissible limited use of the evidence. The jury is presumed to have followed those instructions. State v. Walker, 910 S.W.2d 381, 397 (Tenn. 1995); State v. Lawson, 695 S.W.2d 202, 204 (Tenn. 1985). The defendant's claim that the trial court erred in allowing the inquiry is without merit.

## AGGRAVATING CIRCUMSTANCE (i)(5)

### A. Sufficiency of the Evidence

In this case, the jury imposed the death penalty upon its finding[7] that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond

---

[7]According to the verdict form, the jury specifically found that "[t]he murder was heinous, atrocious and cruel in that it involved torture **and** serious physical abuse beyond that necessary to produce death." (Emphasis supplied.)

that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (1991). On appeal, the defendant challenged the sufficiency of the evidence to support this aggravating circumstance. The Court of Criminal Appeals held that because the victim died instantaneously from a single gunshot wound to the head, the proof was not sufficient to show that the murder involved serious physical abuse beyond that necessary to produce death. Relying upon decisions of this Court defining torture as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious," State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985), the Court of Criminal Appeals also held that the proof in case was not sufficient to establish physical torture because Dr. Smith had testified that the individual burns caused the victim only "moderate," rather than "severe," physical pain. Nonetheless, the intermediate court found the proof showed mental torture, sufficient to support the aggravating circumstance because Dr. Smith testified that the victim had suffered a "great degree of distress" anticipating the infliction of the repeated burns and bruises.

In this court, the defendant agrees with the decision of the Court of Criminal Appeals as to physical torture and serious physical abuse, but asserts that the intermediate court erred in upholding the aggravating circumstance on the basis of mental torture because Dr. Smith's testimony that the victim suffered a "great degree of distress" is speculative.

In contrast, the State agrees with the intermediate court's decision with respect to mental torture, but avers that the Court of Criminal Appeals erred in finding the evidence insufficient to establish physical torture and serious physical abuse since the evidence of numerous "moderately" painful injuries considered cumulatively is sufficient to support findings of

physical torture and serious physical abuse.

As previously stated, torture has been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." Williams, 690 S.W.2d at 529. The proof in this case clearly is sufficient to show that the victim was alive and conscious when the injuries were inflicted. Dr. Smith testified that examination of the burns and bruises revealed that they had been inflicted before the victim's death. The victim's sister testified that she had seen the victim alive and conscious at 1:00 p.m. on the day of the murder. The defendant confirmed that testimony. The victim's sister said that she had observed a burn mark on the victim's neck at that time which had not been there the previous day. Obviously, this testimony reveals that the victim was conscious at least when some of the injuries were inflicted. The defendant consistently maintained that the victim had been conscious until he shot her. Considered in conjunction with Dr. Smith's testimony that the burns and bruises were inflicted before death, the defendant's testimony indicates that the victim was alive and conscious during the infliction of each and every burn and bruise. In our view, the proof in this record is sufficient to support a finding that the victim was alive and conscious when the injuries were inflicted.

We must next consider whether the proof is sufficient to support a finding that the infliction of these injuries caused the alive and conscious victim "severe physical or mental pain." In evaluating the sufficiency of the proof on this issue, we are mindful of two longstanding rules in this State. First,

[t]he jury may use their common knowledge and experience in deciding whether a

> fact is logically deducible from the circumstances in evidence, or in making reasonable inferences from the evidence, and may test the truth and weight of the evidence by their own general knowledge and judgment derived from experience, observation, and reflection. . . .

Trousdale v. State, 168 Tenn. 210, 76 S.W.2d 646 (1934); Fairbanks v. State, 508 S.W.2d 67, 69 (Tenn. 1974); State v. Meeks, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993). Second, while expert testimony may embrace an ultimate issue to be decided by the trier of fact, State v. Shuck, 953 S.W.2d 662 (Tenn. 1997); Tenn. R. Evid. 704, the jury is not bound to accept the testimony of an expert. Indeed, "the weight and value of expert testimony is for the jury" to determine. State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995).

There is no exception to this rule for capital cases. The prosecution is not required to offer expert testimony as to the precise level of pain inflicted upon a victim. Even if such testimony is offered, as previously stated, jurors are not bound to accept the testimony of expert witnesses. Indeed, jurors are free to use their common knowledge and judgment derived from experience, observation, and reflection to decide whether a fact is logically deducible or reasonably inferred from the evidence.

In finding the proof in this record insufficient to support a finding that "severe physical pain" had been inflicted upon the alive and conscious victim, the Court of Criminal Appeals cited only that portion of Dr. Smith's testimony indicating that the victim had suffered "moderate" pain from the individual burns. The intermediate court apparently considered the jury bound by that testimony. In evaluating the sufficiency of the proof, an appellate court must consider the entire body of evidence in the light most favorable to the State. Applying that

standard to the facts in this case, we conclude that the proof is sufficient to support the jury's finding of physical torture beyond a reasonable doubt.

Beginning six hours before the victim's death and lasting up until minutes before she actually died, the defendant inflicted first and second degree burns on her body in six places. Dr. Smith compared these burns to a severe sunburn or a scald burn. One burn had resulted when the defendant held an open flame under the victim's chin. On the left side of the victim's neck, the defendant carefully burned the numeral one ( "1"). The defendant also beat the soles of the victim's feet with sufficient force to cause bruising, and according to Dr. Smith, "great pain." Given the detailed description, both of these injuries and the methods by which they were inflicted, certainly the jurors, using their common knowledge and experience, could have assessed the degree of pain resulting from these injuries.

Moreover, while we agree with the intermediate court's conclusion with regard to the sufficiency of the proof to support a jury finding that severe mental pain was inflicted upon the victim, we again do not base our conclusion solely upon Dr. Smith's testimony that the victim would have suffered "a great degree of distress" anticipating the infliction of the various injuries. Utilizing their common knowledge and experience as members of the human race, the jurors were capable of evaluating the proof and determining whether the victim suffered severe mental pain when, over the course of a six hour time period, her body was burned and beaten in her own home, with four of her young children present. The sufficiency of the evidence to support a jury's finding of torture does not depend upon whether an expert witness utters the magical words "severe physical or mental pain." The relevant question for an appellate court is whether,

after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. State v. Cazes, 875 S.W.2d 253 (Tenn. 1994). Applying this standard, we conclude that the proof is sufficient to support a jury finding that both severe physical and mental pain was inflicted upon the victim while she remained alive and conscious.

Moreover, in our view, the evidence is also sufficient to support a finding of "serious physical abuse beyond that necessary to produce death" even though the cause of the victim's death was a single gunshot wound to the head. There is no requirement that the cause or mode of death also be the cause or mode of the "serious physical abuse beyond that necessary to produce death." In this case, burns and bruises were inflicted upon the victim over a period of six hours. "[S]erious physical abuse beyond that necessary to produce death" means just what it says; there must be serious physical, not mental, abuse, i.e., "an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use." State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996). Certainly, the abuse of the victim in this case qualifies. The defendant burned the victim's body in various places and beat the soles of her feet before he shot her in the head. Considering this proof, we conclude that a rational jury could have found that this murder involved serious physical abuse beyond that necessary to produce death.

## B. Jury Instruction

The defendant also attacks as confusing the language of the aggravating circumstance --

"[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Without a clarifying instruction, the defendant contends that the aggravating circumstance fails to sufficiently channel the jury's discretion and meaningfully narrow the class of death eligible defendants. Specifically, the defendant contends that the phrase "in that" misleads the jury to believe that any act of torture or serious physical abuse beyond that necessary to produce death is "especially heinous, atrocious, or cruel," and he contends that without an instruction setting out the two-step analysis, a jury may inappropriately find the circumstance based only on proof of torture or serious physical abuse.

We disagree. The jury in this case was properly instructed in accordance with the language of the statute and the definitions provided in <u>Williams</u>, <u>supra</u>. We have repeatedly and recently upheld the constitutionality of this aggravating circumstance. <u>See</u> <u>e.g.</u> <u>Odom</u>, 928 S.W.2d at 18. Accordingly, this issue is without merit.

## VICTIM IMPACT EVIDENCE

The State at the sentencing hearing, in its case in chief, through the victim's mother, presented evidence of the victim's character and the "very devastating" impact the victim's death had imposed upon her family. The defendant objected to this testimony as irrelevant and highly inflammatory. On appeal, the defendant argues that admission of the victim impact evidence violates the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 16 of the Tennessee Constitution. In addition, the defendant argues that victim impact evidence is immaterial and irrelevant under Tennessee's capital sentencing statute, and even if

relevant, the prejudicial effect of this evidence substantially outweighs its probative value.

On the other hand, the State argues that both this Court and the United States Supreme Court have recognized that victim impact evidence is relevant to punishment and admissible under both the federal and state constitutions. Because it is relevant to punishment, the State argues that victim impact evidence is admissible under the Tennessee statutory scheme which provides that evidence may be presented "as to any matter the court deems relevant to punishment." The State also argues that the probative value of the evidence in this case was not substantially outweighed by its prejudicial effect.

The constitutional standards governing victim impact evidence and argument at a capital sentencing proceeding have varied greatly over the past eleven years. In Booth v. Maryland, 482 U.S. 496, 504, 107 S.Ct. 2529, 2534, 96 L.Ed.2d 440 (1987), the Supreme Court held that introduction of victim impact evidence at the penalty phase of a capital trial violates a defendant's Eighth Amendment rights because the evidence "may be wholly unrelated to blameworthiness of a particular defendant," and may divert the capital sentencer's attention from relevant information about the crime and the defendant's background and record. In South Carolina v. Gathers, 490 U.S. 805, 811-12, 109 S.Ct. 2207, 2211, 104 L.Ed.2d 876 (1989), the Supreme Court reaffirmed Booth and extended it to preclude comments by the prosecution, in final argument, about the victim and victim impact. As in Booth, the majority in Gathers held that the prosecution had focused upon considerations which were not relevant to the defendant's "personal responsibility and moral guilt."

Against this jurisprudential background, this Court rendered our decision in State v. Payne, 791 S.W.2d 10 (Tenn. 1990). In that case, the defendant had been convicted of the stabbing murder of a twenty-eight-year-old mother and her two-and- one-half year old daughter. The victim's three-and-one-half year old son also had been severely injured in the assault, but managed to survive. At the sentencing phase of Payne's trial the mother and grandmother of the deceased victims briefly testified about the impact of the murders on her surviving grandson. The prosecutor utilized the victim impact evidence in his closing argument. In this Court, the defendant argued that the evidence and argument regarding victim impact violated Booth and Gathers. While acknowledging the technical irrelevance of victim impact evidence under Booth, this Court held that the evidence and argument in Payne "did not create a constitutionally unacceptable risk of an arbitrary imposition of the death penalty, and was harmless beyond a reasonable doubt." Id., 791 S.W.2d at 18. With respect to the prosecutor's arguments in Payne, this Court held, "[w]e are of the opinion that the prosecutor's argument is relevant to this defendant's personal responsibility and moral guilt." Id., 791 S.W.2d at 19. In so concluding, we stated,

> It is an affront to the civilized members of the human race to say that at sentencing in a capital case, a parade of witnesses may praise the background, character and good deeds of Defendant (as was done in this case), without limitation as to relevancy, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims.

Id.

The United States Supreme Court granted the defendant's appeal from our decision in Payne, and overruled Booth and Gathers to the extent that those decisions had held the Eight

Amendment precludes admission of victim impact evidence and prosecutorial argument on the evidence.[8]  Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).  First, the Court, explained that, "it was never held or even suggested in any of our cases preceding Booth that the defendant, entitled as he was to individualized consideration, was to receive that consideration wholly apart from the crime which he had committed."  Payne, 501 U.S. at 822, 111 S.Ct. at 2607.  According to the Court in Payne, the rule announced by Booth and Gathers, "unfairly weighted the scales in a capital trial" by placing virtually no limits on the relevant mitigating evidence a capital defendant may introduce, while barring the State from "either offering a glimpse of the life which a defendant chose to extinguish or demonstrating the loss to the victim's family and to society which have resulted from the defendant's homicide."  Payne, 501 U.S. at 822, 111 S.Ct. at 2607 (internal citations and quotations omitted).  The Payne Court reiterated that, "justice, though due to the accused, is due to the accuser also.  The concept of fairness must not be strained till it is narrowed to a filament.  We are to keep the balance true."  Payne, 501 U.S. at 827, 111 S.Ct. at 2609, (quoting Snyder v. Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934)).

Therefore, in overruling the decisions of Booth and Gathers, the Court in Payne stated:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant.  The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an

---

[8]However, left undisturbed by Payne was the rule of Booth holding that admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment.  Payne, 501 U.S. at 830, n. 2, 111 S.Ct. at 2611, n. 2.  See also Payne, 501 U.S. at 832, 111 S.Ct. at 2612 (O'Connor, J., concurring); Payne, 501 U.S. at 835, n. 1, 111 S.Ct. at 2614, n.1 (Souter, J., concurring).

individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family. By turning the victim into a faceless stranger at the penalty phase of a capital trial, <u>Booth</u> deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.

<u>Payne</u>, 501 U.S. at 825, 111 S.Ct. at 2608 (internal citations and quotations omitted). Therefore, the Court held that if a State chooses to permit the admission of victim impact evidence and prosecutorial argument, "the Eighth Amendment erects no *per se* bar." <u>Payne</u>, 501 U.S. at U.S. at 827, 111 S.Ct. at 2609.

However, <u>Payne</u> did not authorize admission of any and all victim impact evidence and argument. Indeed, the Court noted that in the event victim impact evidence is introduced "that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." <u>Payne</u>, 501 U.S. at 825, 111 S.Ct. at 2608.

Therefore, <u>Payne</u> stands for the proposition that the Eighth Amendment does not preclude the admission of victim impact evidence or prosecutorial argument about the evidence. Moreover, decisions of this Court rendered subsequent to <u>Payne</u>, have also held that victim impact evidence and prosecutorial argument is not precluded by the Tennessee Constitution. <u>State v. Shepherd</u>, 902 S.W.2d 895, 907 (Tenn. 1995); <u>State v. Brimmer</u>, 876 S.W.2d 75, 86 (Tenn. 1994). Accordingly, the defendant's contention that victim impact evidence and argument is barred by the federal and state constitutions is without merit.

The defendant next contends that victim impact evidence is inadmissible under Tennessee's capital sentencing statute. The State responds that the statute permits all evidence relevant to punishment and victim impact evidence is admissible because it is relevant to punishment.

We begin our consideration of this issue with the language of the statute. Tenn. Code Ann. § 39-13-204(c) (1997 Repl.) provides as follows:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

The language of the statute is broad. On its face the statute appears to authorize the admission of any reliable evidence that is relevant to punishment, with the only requirement being that the defendant be accorded a fair opportunity to rebut hearsay statements. The statute, consistent with constitutional mandate, permits admission of all relevant mitigating evidence, whether or not the category of mitigation is listed in the statutory scheme. State v. Cazes, 875 S.W.2d 253, 266 (Tenn. 1994) (discussing McKoy v. North Carolina, 494 U.S. 433, 442, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990) and Mills v. Maryland, 486 U.S. 367, 375, 108 S.Ct. 1860, 1865-66, 100 L.Ed.2d 384 (1988)). However, this Court repeatedly has held that the State may not rely upon nonstatutory aggravating circumstances to support imposition of the death penalty, but is limited

to those aggravating circumstances listed in the statute.  State v. Thompson, 768 S.W.2d 239, 251 (Tenn. 1989); State v. Cozzolino, 584 S.W.2d 765, 768 (Tenn. 1979).  Indeed, we stated in Cozzolino that "evidence is relevant to the punishment, and thus admissible, only if it is relevant to an aggravating circumstance, or to a mitigating factor raised by the defendant."  Id. at 768.

Nonetheless, that general statement, upon which the defendant in this case relies to support his contention that victim impact evidence is not admissible, has not been literally applied to limit admission of evidence at a capital sentencing hearing.  Even in Cozzolino, the case in which the rule was announced, the jurors heard proof at the sentencing hearing about how the crime had been committed which was not necessarily relevant to an aggravating circumstance.  Moreover, in several subsequent decisions we have expressly recognized that a sentencing jury must be permitted to hear evidence about the *nature and circumstances of the crime* even though the proof is not necessarily related to a statutory aggravating circumstance.  State v. Harris, 919 S.W.2d 323, 331 (Tenn. 1996); State v. Teague, 897 S.W.2d 248, 251 (Tenn. 1995); State v. Nichols, 877 S.W.2d 722, 731 (Tenn. 1994); State v. Bigbee, 885 S.W.2d 797, 813 (Tenn. 1994)(citing cases).  Indeed, we have recognized that evidence carefully limited to allow an "individualized sentencing determination" based upon the defendant's character and the circumstances of the crime is constitutionally required.  Nichols, 877 S.W.2d at 731.  We have also opined that once a capital sentencing jury finds that a defendant falls within the legislatively defined category of persons eligible for the death penalty, the jury is free to consider a myriad of factors to determine whether death is the appropriate punishment to the offense and the individual defendant.  Nichols, 877 S.W.2d at 731 (citing cases).  In our view, the impact of the crime on the victim's immediate family is one of those myriad factors encompassed within the

statutory language *nature and circumstances of the crime.* To conclude otherwise would be equivalent to divorcing the defendant from the crime he or she has committed. As the United States Supreme Court recognized, a defendant is entitled to individualized consideration, but that consideration is not to occur "wholly apart" from the crime for which he or she has been convicted. Payne, 501 U.S. at 822, 111 S.Ct. at 2607.

The Tennessee statute delineates a procedure which enables the sentencing jury to be informed about the presence of statutory aggravating circumstances, the presence of mitigating circumstances, and the nature and circumstances of the crime. The statute allows the sentencing jury to be reminded "that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." Payne, 501 U.S. at 825, 111 S.Ct. at 2608 (internal citations and quotations omitted). As this Court emphasized in its decision in Payne, it would be "an affront to the civilized members of the human race" to allow unlimited mitigation proof at sentencing in a capital case, but completely preclude proof of the specific harm resulting from the homicide. Accordingly, the defendant's claim that victim impact evidence is not admissible under the Tennessee capital sentencing statute is without merit.

We emphasize, however, that not any and all victim impact evidence the prosecution wishes to offer at a capital sentencing hearing is admissible. Although such evidence is not entirely precluded by the Eighth Amendment,[9] victim impact evidence may be introduced "that is so unduly prejudicial that it renders the trial fundamentally unfair," thus implicating the Due

---

[9]See Footnote 6, supra.

Process Clause of the Fourteenth Amendment. Payne, 501 U.S. at 825, 111 S.Ct. at 2608. Moreover, as with any other evidence sought to be admitted, the trial court may exclude victim impact proof if its probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 403.[10] Therefore, victim impact evidence which threatens to render the trial fundamentally unfair or which poses a danger of unfair prejudice is not appropriate and should be excluded by the trial judge. Payne, 501 U.S. at 836, 111 S.Ct. at 2614 (Souter, J., concurring). To enable the trial court to adequately supervise the admission of victim impact proof, we conclude that the State must notify the trial court of its intent to produce victim impact evidence. Upon receiving notification, the trial court must hold a hearing outside the presence of the jury to determine the admissibility of the evidence. The victim impact evidence should not be admitted until the trial court determines that evidence of one or more aggravating circumstances is already present in the record. Windom v. State, 656 So.2d 432, 438 (Fla. 1995); Cargle v. State, 909 P.2d 806, 826 (Ok. Ct. Crim. App. 1995).

Generally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed,[11] the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family. Payne, 501 U.S. at 822, 111 S.Ct. at

---

[10]Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[11]We reiterate that victim impact evidence of another homicide, even one committed by the defendant on trial, is not admissible. Bigbee, 885 S.W.2d at 812.

2607; <u>Payne</u>, 501 U.S. at 830, 111 S.Ct. at 2611 (O'Connor, J. , concurring); <u>Cargle v. State</u>, 909 P.2d 806, 826 (Ok. Ct. Crim. App. 1995). Of these types of proof, evidence regarding the emotional impact of the murder on the victim's family should be most closely scrutinized because it poses the greatest threat to due process and risk of undue prejudice, particularly if no proof is offered on the other types of victim impact. <u>Cargle</u>, 909 P.2d at 830; cf. <u>Saffle v. Parks</u>, 494 U.S. 484, 493, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) ("It would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary.") However, there is no bright-line test, and the admissibility of specific types of victim impact evidence must be determined on a case-by-case basis.

Similarly, while victim impact argument by the prosecution about the evidence is permissible, restraint should be exercised. This Court has consistently cautioned the State against engaging in victim impact argument which is little more than an appeal to the emotions of the jurors as such argument may be unduly prejudicial. <u>State v. Shepherd</u>, 902 S.W.2d 895, 907 (Tenn. 1995) ("We caution the State to utilize such arguments advisedly."); <u>State v. Bigbee</u>, 885 S.W.2d 797, 808 (Tenn. 1994) ("[T]he State may risk reversal by engaging in argument which appeals to the emotions and sympathies of the jury.") Indeed, prosecuting attorneys must remember that jurors are to base their decision upon a reasoned moral response to the evidence. <u>See California v. Brown</u>, 479 U.S. 538, 542-43, 107 S.Ct. 837, 839-40, 93 L.Ed.2d 934 (1987). The jury should not be given the impression that emotion may reign over reason. In each case, the trial court must strike a careful balance. Argument on relevant, though emotional,

considerations is permissible, but inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely emotional response to the evidence is not permissible and should not be tolerated by the trial court.

Finally, to assist the jury in properly utilizing victim impact evidence, we hereby suggest the following instruction, to be used in all future capital murder cases in which victim impact evidence is admitted:

> The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family. You may consider this evidence in determining an appropriate punishment. However, your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence.

> Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance. Introduction of this victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt at least one aggravating circumstance which has been alleged. You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstance(s) found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.

This instruction should be used in substance in all future capital murder trials where victim impact evidence has been introduced and is effective from the date this decision is released. See Cargle, 909 P.2d at 828; see also Turner v. State, 486 S.E.2d 839, 843 (Ga. 1997)(citing other cases). Having concluded that victim impact is admissible at the sentencing phase of a capital trial in accordance with due process and evidentiary constraints, we must next determine whether the evidence admitted in this case exceeded either of those restrictions.

At sentencing, the prosecution called the victim's mother, Laura May Cannon, to testify about the impact of her daughter's death on her family, particularly the victim's children. Cannon related that her daughter had been a kind, warmhearted person. Cannon said that the family had been very depressed as a result of the victim's death and missed her very much. Cannon had obtained legal custody of four of the victim's children.[12] Cannon had resigned her employment to care for the children. Cannon said that the four children in her custody had been receiving psychological therapy designed to help them cope with their loss. She also testified that the children had experienced nightmares and talked in their sleep since the murder, and often did not play well together. The children also had reenacted the murder while at play.

In approximately five pages of transcript, Cannon clearly and concisely related the financial, psychological, emotional, and physical impact of this murder on the victim's family. Although she mentioned the emotional impact of the murder, Cannon focused upon the financial, psychological, and physical impact of the crime. Because the defendant in this case had been acquainted with the victim for about a month, he knew that she was a single mother of five young children. The defendant also knew that four of the victim's children were in the apartment at the time of the murder.

The State is not required to prove that a defendant has specific knowledge about a victim's family to secure admissibility of victim impact evidence. As stated by Justice Souter in

---

[12]The victim's youngest child had been living with his paternal grandmother at the time of trial.

a concurring opinion in Payne:

> Murder has foreseeable consequences. When it happens, it is always to distinct individuals, and after it happens other victims are left behind. Every defendant knows, if endowed with the mental competence for criminal responsibility, that the life he will take by his homicidal behavior is that of a unique person, like himself, and that the person to be killed probably has close associates, "survivors," who will suffer harms and deprivations from the victim's death. Just as defendants know that they are not faceless human ciphers, they know that their victims are not valueless fungibles and just as defendants appreciate the web of relationships and dependencies in which they live, they know that their victims are not human islands, but individuals with parents or children, spouses or friends or dependents. Thus, when a defendant chooses to kill, or to raise the risk of a victim's death, this choice necessarily relates to a whole human being and threatens an association of others, who may be distinctly hurt. The fact that the defendant may not know the details of a victim's life and characteristics, or the exact identities and needs of those who may survive should not in any way obscure the further facts that death is always to a 'unique' individual, and harm to some group of survivors is a consequence of a successful homicidal act so foreseeable as to be virtually inevitable.

Payne, 501 U.S. at 838, 111 S.Ct. at 3615.


While we are in complete agreement with that analysis, we are also of the opinion that a trial court may consider the defendant's specific knowledge about the victim's family when evaluating the probative value of victim impact proof on the appropriateness of the death penalty and when determining if probative value is substantially outweighed by prejudicial effect. In our view, probative value is particularly great, where the proof shows, as it did in this case, that a defendant had specific knowledge about the victim's family when the crime was committed. Accordingly, we have no hesitation in holding that the probative value of the victim impact proof in this case was not substantially outweighed by the danger of unfair prejudice. To the contrary, the probative value of the proof in this case far outweighed the danger of its unfair prejudice. The victim impact evidence admitted in this case violated neither the constraints of due process,

nor the evidentiary strictures of Rule 403, Tenn. R. Evid.

However, the prosecutor's argument about the purpose and function of the victim impact evidence was erroneous. In pertinent part the argument was as follows:

> There's no proof he did it in front of them. He just left her there bleeding, knowing those four young babies were in the house with a dead mother. He didn't know, I guess, that they were going to try to wake mommy and try to shake her out of the blood and the brains. No, maybe he didn't know. But you saw his testimony. He didn't care either. He didn't care.

> *How do you weigh this? Well, you have to look at the impact of the crime. That's why the people are here to testify about her life, Miriam Cannon, because [w]e sometimes forget in these trials that, while we're here to take care of the defendant and provide justice for him, there is someone else in this case, and it is not just Miriam Cannon. There are those babies, those orphan children. There are the rest of her family. There is the rest of society that has been deprived of Miriam Cannon. There are lots of victims in this particular case.*

> Now the defendant's family would like to see him. All right. *Balance that against, doesn't everybody understand that little Terrica and the rest of the children would like to see their mother, too? Sure that balances.* Everybody knows that. They would like to be able to see them as well.

> And the relatives of the person who is facing death by electrocution will tell you to please spare his life. Wouldn't it have been nice if Ms. Cannon and the rest [of the] family could have been there to beg for Miriam's life? They could have looked at him and said, "Please, don't kill my daughter. Go ahead and torture her, but don't kill her."

> But they didn't get the chance to. We give him that chance, but she doesn't get that chance. *So when you go to balance the aggravating circumstances against that mitigation, remember if it had been possible they would have been there begging for their daughter's life. Those children would have begged for their mother's life had they been given that opportunity. So you balance that against the mitigation.*

> Defense counsel says he shows remorse. . . . He has no remorse. There is no mitigating circumstance of remorse. *There is only the aggravating factor of ours, of torture and pain and agony and the effect that this had on the family.*

(Emphasis added).

Dissenting in the Court of Criminal Appeals, Judge Wade recognized that this argument crossed the line beyond the permissible latitude afforded counsel in closing when the prosecutor characterized the victim impact evidence as an aggravating circumstance and urged the jury to weigh and balance the victim impact evidence against the mitigating proof. Although victim impact evidence is, as we have previously said, one of those myriad factors which the jury may consider in determining whether death is the appropriate punishment, it does not carry the force and effect of an aggravating circumstance in the sentencing calculation. The prosecutor's argument in this case erroneously characterized the victim impact evidence as an aggravating circumstance to weigh against mitigation proof.

To determine whether this erroneous argument constitutes grounds for reversal, we must consider whether the impropriety "affected the verdict to the prejudice of the defendant." Bigbee, 885 S.W.2d at 809 (quoting Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965)). Factors relevant to that determination include:

> (1) the conduct complained of viewed in light of the facts and circumstances of the case;
>
> (2) the curative measures undertaken by the court and the prosecution;
>
> (3) the intent of the prosecutor in making the improper arguments;
>
> (4) the cumulative effect of the improper conduct and any other errors in the record; and
>
> (5) the relative strength and weakness of the case.

Though the prosecutor's argument mischaracterized the function of victim impact evidence, the argument was based upon proof properly admitted into evidence, and there is no

indication that the prosecutor acted in bad faith. Moreover, the jurors were instructed by the trial court in the final charge at the sentencing hearing to apply the law as provided by the court. The trial court also instructed the jurors that they could not impose a death penalty without a unanimous finding that the statutory aggravating circumstance had been proven beyond a reasonable doubt and outweighed the mitigating proof beyond a reasonable doubt. Again, the jury is presumed to follow the instructions of the trial court. Walker, 910 S.W.2d at 397. Considering the error complained of in light of the entire case, including, as previously discussed, the strength of the proof to establish the statutory aggravating circumstance, we are of the opinion that the improper prosecutorial argument does not appear to have affected the verdict to the defendant's prejudice. Therefore, the error does not require reversal.

## PROPORTIONALITY REVIEW

We must next consider whether the defendant's sentence of death is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(4) (1997 Repl.). If this case is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed," the sentence of death is disproportionate. State v. Bland, 958 S.W.2d 651, 665 (Tenn. 1997). However, a sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. Id. at 665. Our role, in conducting proportionality review is not to assure that a sentence "less than death was never imposed in a case with similar characteristics." Id. Instead, our duty "is to assure that no aberrant death sentence is affirmed." Id.

In choosing and comparing similar cases, we consider many variables, some of which include, (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Id. at 667. When reviewing the characteristics of the defendant, we consider: (1) the defendant's prior record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. Id. Comparative proportionality review is not a rigid, objective test. Id. at 668. We do not employ mathematical or scientific techniques. In evaluating the comparative proportionality of the sentence in light of the factors delineated above, we rely also upon the experienced judgment and intuition of the members of this Court. Id.

Applying these factors, we note that the proof in this case reflects that the victim died from a single gunshot wound to her head. She was killed in her own home after undergoing a six hour torturous ordeal during which she was burned and beaten by the defendant. Four of the victim's five young children were present in the apartment during the time she was tortured and also when she was shot. There was no apparent motive for this premeditated murder. The defendant's claim that the shooting was accidental obviously was not believed by the jury. There is also certainly no proof of provocation or justification for the offense. Having known the

victim for a month and having spent a portion of the night and day with her, the defendant obviously had knowledge that the victim was helpless. Though not extensive, the nineteen-year-old defendant had a prior juvenile criminal record. The record reflects that the defendant cooperated with police after his apprehension, and expressed remorse for the murder at trial. With respect to his capacity for rehabilitation, the defendant told the jury that he planned to complete his high school education if sentenced to life imprisonment. Considering the nature of the crime and the defendant, we conclude that imposition of the death penalty for the senseless, torturous, and cruel murder of this twenty-year-old woman is not disproportionate to the penalty imposed in similar cases, and that this murder places Nesbit into the class of defendants for whom the death penalty is an appropriate punishment. Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case.

In State v. Bland, 958 S.W.2d 651 (Tenn. 1997), the nineteen-year-old defendant, without provocation or explanation, shot an unresisting, retreating victim, chased him some 91 yards or more, and shot the helpless victim several times more after he had taken refuge underneath a pickup truck. Like Nesbit, Bland was only nineteen years old when the crime was committed and had no adult criminal record. The jury sentenced the defendant to death upon finding as in this case that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Tenn. Code Ann. § 39-13-204(i)(5) (1991 Repl.).

In State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993), this Court affirmed the death

sentence of a nineteen-year-old defendant who killed a seventy-four-year-old woman during the course of a robbery. The victim had already been shot once and was lying on the floor, when without provocation or explanation, Van Tran, like the defendant in this case, shot the victim in the head. As did the defendant in this case, Van Tran cooperated with the authorities and expressed remorse for the killing. As in this case, the jury imposed the death penalty upon finding a single aggravating circumstance, that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982).

In State v. Hurley, 876 S.W.2d 57 (Tenn. 1993), the defendant killed the victim by shooting him once in the head. Thereafter, he robbed the victim and burned his body. As in this case, the assault was entirely unprovoked and unexplained. The jury found the defendant guilty of premeditated murder and imposed the sentence of death upon finding that the murder was committed while the defendant was engaged in committing a felony -- robbery. Tenn. Code Ann. § 39-2-203(i)(7) (1982).

In State v. Barber, 753 S.W.2d 659 (Tenn. 1988), the defendant without provocation, struck the elderly victim five times in the head with a crescent wrench. As mitigation, Barber, as did Nesbit, relied upon his capacity for rehabilitation and in his youth. As in this case, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982). In addition, the jury determined that the murder was committed during the course of a felony. See Barber v. State, 889 S.W.2d 185 , 189-90 (Tenn. 1994) (concluding that the jury's consideration of the felony-murder aggravating circumstance was harmless error).

In State v. McNish, 727 S.W.2d 490 (Tenn. 1987), the defendant beat the victim about her face and head with a glass flower vase. The victim was alive when found, but died a short time later, so she suffered after the attack by McNish much as the victim in this case suffered before she was shot by Nesbit. Unlike the defendant in this case, McNish had no prior criminal record even though he was twenty-nine years old. As in this case, the jury imposed the death penalty upon finding a single aggravating circumstance -- that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982).

In State v. Cooper, 718 S.W.2d 256 (Tenn. 1986), the thirty-three-year-old defendant shot his estranged wife four times while she was trapped inside a glass and brick cashier's booth. As did Nesbit, Cooper shot an unarmed, helpless victim without provocation. Cooper did not shoot his wife four times in rapid succession. Cooper shot once, walked away, then turned back and resumed firing at her. The victim in Cooper had time to contemplate her fate and experience severe mental pain, as did the victim in this case during the six hours she was tortured. The jury imposed the death penalty, as in this case, upon finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-2-3(i)(5) (1982).

No two cases are identical, but the above cases have many similarities with Nesbit. In all six cases, the murders were without explanation or provocation. Four of the five cases, involved the infliction of severe physical or mental pain upon the victim while he or she remained alive and conscious. In four of the cases, death was caused by a gunshot wound. In four of the cases,

the victims were murdered either in their home or at their place of employment.  Like Nesbit, two of the defendants were nineteen years old when the murders were committed.  Also, three of the defendants, like Nesbit, had no substantial prior criminal record.  At least one of the defendants relied upon his capacity for rehabilitation, as did Nesbit.  In five of the six cases, the jury returned a sentence of death upon the basis of a single aggravating circumstance.  After reviewing the cases discussed herein, and other cases not herein detailed,[13] we are of the opinion that the penalty imposed by the jury in this case is not excessive or disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) (1997 Repl.), and the principles adopted in prior decisions of this Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstance, and the jury's finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt.  Tenn. Code Ann. § 39-13-206(c)(1)(A) - (C) (1997 Repl.). We have considered the defendant's assignments of error and determined that none have merit.  With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge David G. Hayes, and joined in fully by Judge William M. Barker and joined in partially  by Judge Gary R. Wade   Relevant portions of that opinion are published hereafter as an appendix.  The defendant's sentence of death by

---

[13]State v. Caughron, 855 S.W.2d 526 (Tenn. 1993); State v. Smith,868 S.W.2d 561 (Tenn. 1993); State v. Bates, 804 S.W.2d 868 (Tenn. 1991); State v. Payne, 791 S.W.2d 10 (Tenn. 1990); State v. West, 767 S.W.2d 387 (Tenn. 1989).

electrocution is affirmed.  The sentence shall be carried out as provided by law on the 29th day of

January, 1999 unless otherwise ordered by this Court or other proper authorities.


_____
FRANK F. DROWOTA, III,
JUSTICE


**CONCUR:**
Anderson, C. J.,
Holder, J.

Birch, J. - See Separate Dissenting Opinion