# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 11, 2003 Session

## STATE OF TENNESSEE v. ROBERT L. LEACH, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 99-D-2508      J. Randall Wyatt, Judge**

---

**No. M2001-01421-CCA-R3-DD - Filed August 25, 2003**

---

The defendant, Robert L. Leach, Jr., was found guilty by a jury of two counts of premeditated murder, two counts of felony murder, one count of aggravated rape, and one count of especially aggravated robbery. The felony murder convictions were merged into the premeditated murder convictions. The jury sentenced the defendant to death based upon the finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. As to victim Sarah McBride, the jury found three aggravating circumstances: the defendant had previously been convicted of one or more violent felonies; the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and the murder was knowingly committed by the defendant while committing or attempting to commit robbery or aggravated rape. As to victim Jean Poteet, the jury found the same three aggravating circumstances and the additional aggravating circumstance that the victim was seventy years of age or older or was particularly vulnerable due to a significant handicap or significant disability, physical or mental. The trial court sentenced the defendant to consecutive sentences of twenty-five years for the especially aggravated robbery and aggravated rape convictions. In this appeal, the defendant raises numerous issues relating to the sufficiency of the evidence, evidentiary rulings, jury instructions, the constitutionality of the death penalty, and the application of certain capital case procedures. We conclude that no harmful error exists, and we affirm the convictions and sentences. The case should be remanded, though, for correction of clerical errors by which the judgments for Counts 5 and 6 have respectively been switched to Counts 6 and 5.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Ross E. Alderman, District Public Defender; and Jeffrey A. DeVasher and C. Dawn Deaner (on appeal), and Laura C. Dykes and Amy D. Harwell (at trial), Assistant Public Defenders, for the appellant, Robert L. Leach, Jr.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Thomas B. Thurman, Deputy District Attorney General; and Kathy Morante and Katrin Novak Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The proof at the guilt phase of this trial demonstrated that on July 8, 1999, the defendant murdered Jean Poteet and murdered and raped Sarah McBride in Ms. McBride's home in Nashville on Haywood Lane. Sarah McBride was a sixty-nine-year-old widow who had been outside working in her yard when the defendant happened upon her. The defendant asked Ms. McBride if he could use her telephone to call his sister to pick him up because his car was broken down. Ms. McBride agreed. The defendant told Ms. McBride that his telephone call to his sister was successful and that she would be picking him up. The defendant later admitted that he had in fact attempted to call his sister in Texas, but was unsuccessful. He also admitted that he did not own a car.

At approximately 7:30 a.m., Ms. McBride's sister, Louise Howard, called and spoke with Ms. McBride as part of their normal morning routine. Ms. McBride told her sister that a man was in the kitchen drinking coffee as he waited for his sister to pick him up. Ms. Howard testified that she urged her sister to have the man wait for his ride outside and that Ms. McBride responded, "OK, I'll call you later." Ms. McBride never returned the call. Ms. Howard testified that she went shopping at Wal-Mart and then began calling her sister. She called her in fifteen to twenty minute intervals, but no one answered. At approximately 1:30 or 2:00 p.m., Ms. Howard became very worried and drove to her sister's house. When she arrived, the garage door was up, and Ms. McBride's pickup truck was gone. She noticed that the back door was open. She entered Ms. McBride's home and noticed her cousin Jean Poteet's wig on the floor, a pair of scissors on the floor, and a stream of blood. Ms. Howard explained that although her cousin, Ms. Poteet, had her own apartment, she had essentially been living with Ms. McBride for a couple of months.

After seeing the "stream of blood," Ms. Howard walked through her sister's home. She found Ms. Poteet lying face down in the hallway. She checked to see if Ms. Poteet was breathing, but she was cold. She found her sister, Sarah McBride, on her bed. She was not breathing. She called 9-1-1 from her sister's kitchen. As soon as the paramedics arrived, Ms. Howard was escorted out of her sister's home.

William Harris, Jean Poteet's cousin and legal guardian, testified that he went to the scene immediately after learning that his cousin had been murdered. Mr. Harris testified that his cousin Jean had a diminished mental capacity due to a blood clot at the time of her birth. He testified that she was "somewhat retarded," and her right hand and leg were partially paralyzed. He explained that because of her problems, financial and legal matters were too much for her to handle; therefore, he had been appointed as her guardian. Mr. Harris explained, however, that Ms. Poteet had a fairly normal life. Other than the aforementioned problems, she had no physical infirmities. He explained that Ms. Poteet enjoyed shopping and going out to eat, but because she could not drive, she relied

2

on others, including Ms. McBride, for transportation. He testified that Ms. Poteet enjoyed helping Ms. McBride with her house and dog. He said that they spent a lot of time together because neither would have to be alone. Ms. Poteet was seventy years old at the time of her death.

Detective Jim Reed arrived at the McBride residence at approximately 2:30 p.m. in response to the 9-1-1 call. Upon his arrival, two firemen advised him that two deceased elderly women were inside the house. He entered the home where he saw one woman face down on the floor and a second woman on a bed, partially clothed. He ordered everyone out of the house. After interviewing Ms. Howard, he sent out a bulletin for officers to be on the look out for the missing pickup truck.

Sergeant Johnny Hunter testified as an expert in the field of fingerprint analysis. He testified that he was the supervising officer at the scene. Sergeant Hunter testified that photographs, a videotape, and a diagram were made of the scene. Evidence was collected from the scene in an attempt to connect a suspect, once one was identified, to the scene. The evidence included a pair of black jeans, pieces of linoleum, scissors, a pair of blue jeans, and a piece of the marble floor. A few weeks later, a plumber was called to Ms. McBride's residence to fix a clogged sewer line. The plumber recovered a pair of men's underwear in the line from the toilet to the sewer line, which was turned over to the police.

Dr. Bruce Levy testified that he was called to the scene of the murders on July 8, 1999. He and his investigator performed rape kits on both victims and took photographs of their bodies. Autopsies were performed on the victims the following day. Dr. Levy testified that Jean Poteet died as a result of strangulation with a ligature. Dr. Levy surmised that Ms. Poteet was first attacked in the kitchen and dragged to the bedroom area where she was found. Dr. Levy testified that Ms. Poteet's blouse was pulled up around her neck and tied in a knot. Further, the autopsy revealed that she had congestion in her upper chest, which indicated that someone sat on her abdomen as the ligature was being applied. Dr. Levy testified that the tip of Ms. Poteet's tongue was bitten and protruding from her mouth, which indicated that she was dragged by her blouse while it was tied around her neck. According to Dr. Levy, Ms. Poteet was still alive while she was being dragged. Ms. Poteet also had numerous blunt force injuries to her face and suffered from brain hemorrhages due to blows to the head. Dr. Levy further testified that Ms. Poteet had a defensive wound on the back of her left forearm, bruises on her abdomen, and two pairs of stab wounds on the left side of her chest and abdomen, which were consistent with being inflicted with a pair of scissors. When Ms. Poteet was found, her upper torso was exposed, but the clothing on her lower body was intact. It was his opinion that Ms. Poteet was probably not sexually assaulted. Dr. Levy explained that because Ms. Poteet's upper torso was exposed, he could not completely rule out some sort of sexual assault.

Dr. Levy testified that the cause of death of Sarah McBride was strangulation with a ligature. The ligature on Ms. McBride's body was a belt that was wrapped around the neck twice. Unlike Ms. Poteet, Ms. McBride was not dragged by the ligature around her neck. In addition to the injuries caused by the ligature, Ms. McBride had a laceration over her left eye, blunt force injuries to her head, a broken nose, a fracture at the base of her skull, a fracture to her breastbone, and three fractured ribs. Dr. Levy testified that Ms. McBride had two sets of double puncture wounds on her

3

back, which were consistent with being stabbed with scissors. Ms. McBride also had bruising around her left eye, left cheek, nose, and mouth. She had defensive wounds on the left forearm.

Dr. Levy testified that Ms. McBride was found at the scene lying on her back on a bed, partially clothed. Dr. Levy explained that Ms. McBride was completely unclothed from the waist down and the clothes on her body had been pulled up to her upper chest and neck area. According to Dr. Levy, when Ms. McBride was found, her legs were open and up over her body, with her legs flexed at the hips and bent at the knees. As the result of testing, it was determined that Ms. McBride was raped. Dr. Levy testified that it was his opinion that she was alive when the sexual assault began, but died at some point during the assault. He also said that both Ms. McBride and Ms. Poteet had irreversible brain damage approximately four minutes after the ligature was applied.

Detective Mike Roland was the lead investigator on the case. He testified that the defendant became a suspect in the murders when he was contacted by detective Marsha Brown of the sex crimes unit. Detective Brown was investigating an incident that occurred a few hours before the murders at an Econo Lodge within one mile of Ms. McBride's residence. Detective Brown gave Detective Roland the defendant's name. Detective Roland learned through the investigation of the sex crime at the Econo Lodge that the defendant had been living there. Evidence collected from the Econo Lodge was consistent with evidence collected from the McBride residence, and the defendant's fingerprints were identified from evidence at the McBride residence. Detective Roland talked with the defendant's sister, Cathy Wilson, who lived in Missouri, on July 12, 1999. Detective Roland advised the defendant's sister that he was a suspect in a double murder case in Nashville. She had not heard from her brother, but she agreed to cooperate.

The defendant called Detective Roland on July 13, 1999. He told Detective Roland that he knew nothing about the murders. He blamed his entire situation on the State of Texas and its penal institution. He told Detective Roland that he had been imprisoned in Texas and that when he was released he wanted to blow up schools, hospitals, and nursing homes. He said that he had turned his life around for a while but that when Texas wanted to revoke his parole, he wanted to "go down there and blow up a whole city block." When Detective Roland asked him what happened in Nashville on Haywood Lane, he replied, "I just–I snapped. I don't know. And I've snapped–I feel like snapping now." The defendant told Detective Roland that he knew he was prison bound and he wanted to go to a psychiatric hospital because he could not deal with reality. He stated he wanted just to travel and kill. Detective Roland called the defendant's sister after he spoke with him, and she gave him the telephone number for her brother. The police were then able to determine the defendant's location, and Detective Roland called the Missouri State Highway Patrol and described the pickup truck taken from the McBride residence.

Sergeant Larry Wayne Plunkett, Jr. testified that he was an officer with the Missouri State Highway Patrol. He located the truck at the Friendly Tavern in Greenville, Missouri. He and Deputy Larry Bruce with the Wayne County Sheriff's Department in Greenville, Missouri entered the tavern and located the owner, who identified the defendant as the person driving the pickup truck. The defendant was on stage playing a guitar at the time. Sergeant Plunkett arrested him. The defendant

4

denied driving the truck and insisted that he had walked to the tavern. The pickup truck was secured and the defendant was transported to the local jail.

The defendant later admitted to Deputy Bruce that he was driving the truck. He said that he was sorry he did it but that he just snapped. He also told Deputy Bruce that he had been trying to get help for three years. While Deputy Bruce was at the tavern securing the pickup truck, Ron and Jane Henson stopped and asked why he was at the defendant's truck. After a discussion with the Hensons, Deputy Bruce went to their residence and recovered clothing supposedly belonging to the defendant and lawn equipment that the defendant had given the Hensons from the back of the truck.

Detectives Roland and Vogel traveled from Nashville to Missouri to talk to the defendant. The defendant explained that he had been in Nashville pursuing a music career. He advised the detectives that he was gifted with music and had won Star Search in 1997. He said he obtained employment at a Denny's restaurant to pay the bills. After staying at a couple of other hotels, he took up residence at the Econo Lodge. He met an employee of the Econo Lodge, later identified as Dorianne Brown, during his stay. He said they flirted with each other. He told Detective Roland that on the last night he spent in Nashville, he had been to a bar and had several beers. He admitted that he was "pretty tipsy." He remembered seeing Ms. Brown outside her room and her inviting him in. Later, a black man entered the room and confronted him about why he was with his girlfriend. The defendant also said the man demanded his money. He said that Ms. Brown began screaming and that he became worried about going to jail. He was very afraid, so he hit the man and ran out of the hotel. He said he blacked out and woke up in a pickup truck in Illinois. He said his knuckles were swollen as if he had hit someone. He said he had on men's clothing that was not his. He also saw jewelry boxes and costume jewelry in the truck. He denied that he had stolen a purse. He insisted that he did not know what had happened but stated, "If I deserve it, I deserve it."

According to the defendant's statement, he went to visit his family in Missouri. He met a girl on the first night he was in Missouri, spent the night with her, and gave her some of the jewelry. He also gave lawn equipment to his aunt, Jane Henson. When he talked with his sister, she told him he was about to be on "America's Most Wanted." He told Detective Roland that he had a metal plate in his head from a car accident and claimed that he had memory loss and blacked out as a result. He told Detective Roland that he could only kill in self-defense. He continued to claim that if he had done something, he had just snapped. The day after the defendant's statement, Detective Roland transported him to Nashville. During the trip, the defendant pointed to a road and said that was where he went the wrong way, going to Illinois instead of Missouri. He then said he had thrown the purse out down the road.

Harold Winberry and Becky Allen testified. Mr. Winberry had known the defendant for over fifteen years but had not seen him for six years. He stated that the defendant showed up at his residence in Coldwater, Missouri on July 8, 1999, driving a pickup truck. The defendant stayed with him, his wife, and his sister-in-law, Becky Allen, for two nights. They went to the Friendly Tavern where they drank beer and danced. He noticed nothing unusual about the defendant's behavior. Becky Allen testified that the defendant drove her home in the pickup truck after their evening at the

Friendly Tavern. The defendant told her he did not have a driver's license; therefore, he only drove the back roads. She further testified she spent the night with the defendant at the Winberry residence the first evening he was in town. The next day, the defendant presented her with jewelry, which he said belonged to his ex-girlfriend. She testified that she took some earrings, but turned them over to the police after the defendant's arrest. According to Ms. Allen, the defendant appeared to be acting normal while he was with her.

Jane Henson, the defendant's aunt, also testified at trial. She testified that the defendant came to her home on July 11, 1999. She stated that she had not seen him since his father's funeral, about six years before. She said that he was driving a Dodge pickup truck with Tennessee tags. He stayed in a trailer outside her home for two nights. While he was there, he asked her to wash his clothes, but she refused because they had dog hair all over them. She later gave the clothes to the police. She testified that he acted normal while he stayed at her home.

Joseph Walker testified on behalf of the prosecution. Mr. Walker admitted having been convicted of eight felonies involving dishonesty, two misdemeanors involving dishonesty, and one felony of escape. Mr. Walker met the defendant in the Davidson County jail while they were housed in the same pod. Mr. Walker testified that the defendant told him he wanted to get sent to a psychiatric hospital and asked how to establish the insanity defense in Tennessee. According to Walker, the defendant believed it was easier to escape from a psychiatric hospital, and he wanted to go to Canada because Canada would not extradite him if he was facing the death penalty. The defendant also confided to Walker that he knew a psychologist in Texas who would testify that he had been incompetent for a long time.

Mr. Walker testified that the defendant told him the details of the murders as follows: The defendant went to a house in Antioch where some women, whom he had previously seen in Denny's, lived. He told one of the women that his car was broken down and he needed to call a ride. The defendant said one of the women recognized him as an employee of Denny's and invited him to have some coffee. While he was inside, one of the women received a call, he thought from a daughter, who told her to get the man out of her house. Mr. Walker testified that the defendant told him that he put a "chokehold" on both women, got them on the floor, and beat their heads. The defendant said he raped one of the women and fondled the other. The defendant went through the house and took some rings, necklaces, lawn care equipment, and a pickup truck. The defendant told Mr. Walker that there was blood all over the house. The defendant said he had always had a secret fantasy of committing multiple rapes and murders.

On cross-examination, Mr. Walker admitted that he had been sent to a mental hospital on several previous occasions to be tested for competency. He said that he had most recently been sent to the Middle Tennessee Mental Health Institute. He denied that he had given the mental health professionals any information. He said he had refused to talk to anyone there. He testified that the hospital had his file and the relevant information. He said that although he had been sent for several evaluations, he had never been declared incompetent. He further testified that he did not want to go

6

to the hospital for the evaluation, but his attorney had him sent there. He stated that he fired his attorney when he was sent back to jail following the evaluation.

Mr. Walker testified that he had been given nothing in exchange for his testimony. He testified that he did not know if the facts the defendant gave him were true but that he was testifying as to what he was told. Detective Roland confirmed in his testimony that Walker had been given no promises in exchange for his testimony. Detective Roland further testified that Mr. Walker's statement to him was consistent with the crime scene and the facts of the murder, which had not been released to the public.

Julia Hooper, an expert in fingerprint and palm print analysis, testified that the defendant's fingerprints were found on a white coffee cup collected from the McBride residence, on the inside of the McBride pickup truck, and on the outside of the truck. The defendant's palm print was identified on a piece of drywall collected from the residence and on the outside of the truck. Linda Littlejohn, an expert in shoe print analysis with the TBI Crime Lab, testified that bloody footprints from a marble floor in the McBride residence matched the defendant's tennis shoes. Agent Littlejohn found seven conclusive matches on linoleum flooring from the residence. Margaret Bash, an expert forensic serologist with the TBI, testified that on a vaginal swab taken from Ms. McBride, she found the defendant's sperm.

Dorianne Brown testified that she had met the defendant while working at the Econo Lodge in Nashville. On July 8, 1999, at approximately 3:00 or 3:30 a.m., the defendant knocked on her door, forced his way in, and began choking her. She could tell the defendant had been drinking, but he did not appear to be drunk. She began pleading for her safety. She said she picked up an iron and threw it at him. Someone knocked on her door and asked if she was okay. At that time, the defendant pulled out a pocket knife and told her not to say anything. Then her telephone rang. When the defendant leaned over to answer it, she ran out of the room. She said that she ran to the front desk and asked for the police to be called. When the police arrived, she gave the officer the defendant's name.

The defendant testified on his own behalf at trial. He said he had a very bad childhood, with his parents separating when he was an infant. He described both his parents as alcoholics and said his father took him to commit burglaries on the few occasions that he would see him. He said he had a very embarrassing bowel problem until he was 14. He said he soiled his pants which caused him to get ridiculed and beaten at school. He testified that his problem angered his mother, and she would rub his nose in his feces. He said she often physically abused him. He was in and out of reform school and quit school after the eighth grade. The defendant testified that in addition to physical abuse, he was subjected to sexual abuse by a babysitter and neighbor. He also stated that he was raped by a male stranger when he was ten years old. By the age of six or seven, the defendant had committed arson by burning a truck. He estimated that he began to drink alcohol and smoke marijuana when he was seven or eight years old. In addition, during his youth he burned down a laundromat and burned down a family's home in Missouri. As a result of burning down the laundromat, he spent three months in a mental hospital and was then transferred to a county jail for

7

one year.  As a result of his poor home environment, he was taken from his mother at one point and placed in foster care.  He also lived with his grandmother for a while.  He testified that once when he went to live with his father, he was sent off with a traveling carnival for three months.

The defendant testified that he was homeless by the time he was seventeen.  He lived in New Orleans for a brief time in  a portable toilet.  He said that he earned money by entering a drug testing program and saved enough money to return to Missouri.  After returning to Missouri, he became a Christian and worked at a Christian camp.  He testified that while employed at the camp, he played the guitar and wrote gospel music.  He said he fell away from God after he smoked marijuana with someone at the camp.  He estimated that he was nineteen years old when he left the camp.  He subsequently committed a robbery, spent two years in prison in Missouri, and was then paroled. After his parole in Missouri, he lived in Texas, where he was convicted of burglary of a business and sentenced to seven years probation.  He violated his probation by driving while intoxicated, and his sentence was changed to a ten-year prison term.  The defendant testified that while he was imprisoned in Texas, he was raped by six inmates.  He was then paroled to a halfway house in Houston, Texas.  He violated his parole twice.  He subsequently was imprisoned in a maximum security prison, where he was repeatedly beaten by the prison guards.   The defendant was released on parole and once again violated his parole.  He served forty-five days in prison and completed an alcohol treatment program.  In June 1999, the defendant moved to Nashville.

The defendant testified that on July 7, 1999, he worked at Denny's restaurant and returned to the Econo Lodge, where he paid rent for an additional week's stay.  At approximately 3:30 a.m., he entered Dorianne Brown's room for the purpose of finding out if he had received any calls at the front desk from record producers.  He testified that they talked for five to ten minutes and when he turned around to leave, something "controlled" him.  He testified that he got on top of Ms. Brown. She pleaded for him not to hurt her, and he said he would not.  He said he heard a knock on the door and became scared.  As a result, he pulled out a small knife, but did not threaten her with it.  Then the telephone rang.  He stated that as he dove to answer it, she ran out.  He then ran out also.  He said he ran to an apartment complex and slept between the building and some bushes.  He did not know how long he slept.  He testified that when he awoke, he walked to a nearby convenience store.  He said that he was going to call his sister but that a police officer drove up and he walked away.

The defendant testified that he saw Ms. McBride outside watering flowers and asked her if he could use her telephone to call his sister because his car was broken down.  He admitted that he lied, but he stated he wanted to telephone his sister.  He said he lied again when he told Ms. McBride that he had called his sister and she would be picking him up.  He stated that he was just trying to buy time because he was still scared from seeing the police officer.  He said Ms. McBride was very nice to him and gave him several cups of coffee.  She even brought her photograph album out and showed it to him.  He testified that Ms. McBride asked him if he wanted another cup of coffee and her telephone rang.  She told him to go inside and get the coffee and gave him directions. He stated that once inside, he saw Ms. Poteet for the first time.  He stated that once again something came over him.  He heard a loud bang.  The next thing he knew, he had Ms. Poteet in his arms.  When he realized what he had done, he let go of her and she dropped to the floor.  He testified that he did not

8

understand it because he did not plan it. He then heard the door slam and he turned around and saw Ms. McBride. He said that he then went blank, and the next thing he remembers is waking up in the shower.

The defendant testified that when he got out of the shower, he saw Ms. McBride and Ms. Poteet and fell into a chair crying. He said he then went through the house looking for clothes because his clothes had blood all over them. He also saw a jewelry box and took it in order that he could get something to eat. He then saw the purse, took it, and went to the garage. He found the keys in the truck and left in it. He testified that he had another "spell" where he blacked out. He awoke in the pickup truck at the Kentucky-Missouri border. He continued driving, went into a convenience store, and learned he was driving in the wrong direction. He was attempting to go to Missouri to see his sister.

On cross-examination, the defendant admitted that he had received a GED, had three years of college work, certification in heat and air, and experience in construction work. He denied telling Joseph Walker any of the details of the murders. He said Mr. Walker approached him about using the insanity defense.

The jury found the defendant guilty of premeditated first degree murder as to Jean Poteet and Sarah McBride. The jury also found him guilty of felony murder as to both victims. Further, the jury found him guilty of especially aggravated robbery and aggravated rape. The felony murder convictions were merged into the premeditated murder convictions.

At the penalty phase of the trial, the State first introduced the defendant's prior convictions of reckless aggravated assault and second degree robbery. The state recalled Dr. Bruce Levy who had performed the autopsies on the victims. He testified about the injuries Ms. Poteet and Ms. McBride experienced and the pain associated with the injuries. Dr. Levy explained to the jury that ligature strangulation is one of the most painful types of deaths. He testified that not only is the ligature about the neck painful itself, but the person experiences a period of air hunger, where the brain perceives that the person is not getting air and the person will violently attempt to get air and oxygen into the lungs that the brain is demanding. He further testified that a person will remain conscious on average for forty to forty-five seconds and will die on average within three to four minutes. He also testified that the stab wounds that each victim experienced would have been very painful, even though they did not injure any major organs.

The state next presented the testimony of Louise Howard, William Howard, and Robert McBride. Ms. Howard testified that she was Ms. McBride's older sister. She testified that her sister was sixty-nine years old at the time of her death. She said that Ms. McBride was her best friend and that they talked every day before she was killed. She said she had talked to her sister the morning of her murder and regretted not going to her home sooner. She thought she might have been able to save them. She testified that she had "gone to pieces" since her sister's death and had lost a lot of weight because she no longer eats.

9

Robert McBride testified that he was Ms. McBride's stepson. He said that he and Ms. McBride were very close. He explained that his parents had divorced when he was young, and his father and stepmother had been married for twenty-seven years at the time of his father's death. He told the jury that she loved to garden and had been employed for thirty years before retiring. After his father died, she kept his pickup truck and could never sell it. She had grieved over her husband's death for a few years and had really started to enjoy life again. He testified that his stepmother's death had been very hard on him and his children.

William Harris testified that he was Jean Poteet's cousin and legal guardian. He again explained to the jury that she had a diminished mental capacity. Although she was never able to work outside of the home, she was able to take care of her mother and aunt until they passed away. He testified that she enjoyed going out to eat and traveling. Ms. Poteet had started renting an apartment on her own in 1997 after her aunt's death. Mr. Harris testified that she had been burdened with responsibilities of taking care of people her entire life. He explained that she had just started to enjoy some freedom. She had been able to travel some with his family and was looking forward to more travel. He testified that her death had greatly affected his life.

The defense first called Jane Henson, the defendant's aunt to testify about the defendant's childhood. She said that the defendant did not have a relationship with his father in his childhood. However, he had developed a relationship with him later in life and was very upset when his father died. She said the defendant was abused as a child, but she later admitted that she rarely saw him and never actually saw him being abused. She said that the defendant needed love. She confirmed that the defendant had a bowel problem in his youth.

Judy Waltz, the defendant's aunt, testified that both of his parents were alcoholics. She testified that the defendant had a bowel problem when he was younger. She said she did not build a relationship with the defendant until he lived with her in Texas, when he was twenty-six or twenty-eight years old. She testified that he was very courteous, but she stated that she had to ask him to leave her house eventually because of his drinking and infatuation with her daughter. After he moved out, the defendant had a successful roofing business, but he later lost it due to a drinking problem. She testified that the defendant had told her he attempted to commit suicide by driving into a bridge.

Ann LaPoint testified that she met the defendant when she counseled him for seven years at the Central County Center for Mental Health and Retardation in Temple, Texas. During that time, he was on probation in both Texas and Missouri. She testified that he had a very low self-esteem, was depressed, and very needy. She explained that his biggest fear was returning to prison because he had been beaten and sexually assaulted while incarcerated. Ms. LaPoint testified that the defendant had a "sick and abusive relationship with his father." Although the defendant gave his address in Temple, Texas as his father's address for purposes of probation, his father did not always allow him to reside there. According to Ms. LaPoint, the defendant told her that he sometimes lived in vacant storage buildings, at the lake, in a park, in vacant houses and buildings, on top of buildings,

10

and under bridges. She further testified that at one point, the defendant attempted to commit suicide by jumping from a bridge, but she talked him down.

Ms. LaPoint testified that the defendant dealt with a lot of issues that caused him to abuse alcohol and drugs including: physical and sexual abuse by his mother; feelings of desertion; confusion regarding love and hate; physical and sexual abuse in the juvenile justice system and prison; physical abuse and neglect from his father; and abuse from everyone he trusted. She testified that the defendant had suicidal ideations and that his "main objective was to see who he could get to kill him." Ms. LaPoint testified that she became fond of the defendant "because it was almost like raising a child." She said she taught him to match his clothes, comb his hair, and other tasks adults should be able to perform.

On cross-examination, Ms. LaPoint acknowledged that the defendant had lied to her, attempted to falsify a urinalysis, and played mind games with her. She acknowledged that in a report she stated that he had problems with authority and "wanted to blame the world and society for his shortcomings instead of accepting responsibility for his actions." She testified that the defendant had attempted suicide on two other occasions.

Richard Bennett, a childhood friend of the defendant's, testified regarding the defendant's childhood. He testified consistently with prior witnesses that the defendant was poor and did not always have a lot of food in the home. He confirmed that the defendant's father was absent from the defendant's life. He testified that the defendant was abused by his mother and sister. He said the defendant was frequently in trouble and was ridiculed by other children. He said that the defendant frequented a known pedophile's home, but the defendant never told him that he was sexually abused. Mr. Bennett testified that the defendant did not seem to have full mental capacities and always seemed much younger than he was. Mr. Bennett stated that he had not seen the defendant in thirty years and admitted that he was currently serving a thirty-year sentence for rape in Missouri.

The defendant's kindergarten teacher, Carol Duma, testified that the defendant did not have a lot of friends when he was young but that he was not a problem student. She became acquainted with him again while he was employed at the church camp. She said he was not a problem at the camp.

Reverend Harry Duma testified that he was the pastor of the non-denominational church and director of a children's camp ministry where the defendant was employed. He said that the defendant was very lonely and that he became like family to the defendant. He said that the defendant was not a problem at the camp but that he would snap at times. During those times, people would become very afraid of him. He said he asked the defendant to leave the camp after the defendant suddenly snapped.

Cathy Watson, the defendant's sister, testified that she and the defendant grew up together. She testified that she and the defendant were left alone a lot growing up while their mother went to bars. She testified that although their father would come and get her some weekends, he would not

11

take the defendant. She believed that her father did not want to deal with the defendant's bowel problem. She confirmed that the defendant routinely soiled his pants, which caused their mother to be very angry and him to be ridiculed by other children. She testified that she left home when the defendant was twelve years old because she did not want to see him abused. At the time, she believed that their mother would eventually kill him.

Ms. Watson testified that the defendant was raped while housed in a reform school in Missouri. She testified that after he was released from prison in Missouri, he moved to Texas to live with her. She said he was doing well until their father died. A few weeks after their father's death, the defendant got drunk and tried to kill himself by driving his vehicle into a bridge. He later served time in prison in Texas. She testified that after he was released from prison in Texas, he was not the same. She said he was paranoid, scared, and distrustful. After an argument, she asked him to leave her home because she did not want her children around an abusive relationship. A few months later, the defendant returned to her home. After a couple of months, the defendant left for Nashville. Ms. Watson testified that she knew that the defendant had an outstanding parole violation warrant. She began to talk to his probation officer in Texas and work with the Texas authorities to get his probation reinstated.

After the defendant moved to Nashville, Ms. Watson had contact with him a couple of times. She testified that she first learned that he was a suspect in the murders at issue when a police officer appeared at her home during a family barbeque. She cooperated with the Nashville police and gave them the telephone number from where her brother had called her. She said that on the day of the murders, her caller ID feature on her telephone showed that her brother had tried to call her at 6:00 a.m. However, she did not answer the telephone because she was sick. She did not look at her caller ID until two days after the murders. She also testified that she received a letter from the Texas parole officer two days after the murders which advised that the defendant's parole had been reinstated.

The jury sentenced the defendant to death for the murders of Jean Poteet and Sarah McBride. As to victim Jean Poteet, the jury found four aggravating circumstances: the defendant had previously been convicted of one or more violent felonies; the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; the murder was knowingly committed by the defendant while he was committing or attempting to commit robbery or aggravated rape; and the victim was seventy years of age or older or was particularly vulnerable due to a significant handicap or significant disability, physical or mental. As to victim Sarah McBride, the jury found three aggravating circumstances: the defendant had previously been convicted of one or more violent felonies; the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and the murder was knowingly committed by the defendant while committing or attempting to commit robbery or aggravated rape.

The trial court subsequently sentenced the defendant to consecutive sentences of twenty-five years for the especially aggravated robbery and aggravated rape convictions, which were ordered to be served consecutively to the death sentences.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant challenges the sufficiency of the convicting evidence. He contends the evidence is insufficient to prove that the murders were premeditated and that the evidence is insufficient to prove that the murders were committed in the furtherance of a robbery. The state argues that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree premeditated murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Further, "premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id. Furthermore, premeditation may be inferred from the manner and extent of the attack on the victim, the brutality of the attack, the use of multiple weapons in succession, and the lack of provocation on the part of the victim. See State v. Bush, 942 S.W.2d 489, 502 (Tenn. 1997), cert. denied 522 U.S. 953 (1997); State v. Price, 46 S.W.3d 785, 817 (Tenn. Crim. App. 2000); State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000); State v. Griffis, 964 S.W.2d 577, 587 (Tenn. Crim. App. 1997).

13

Based on the record before us and viewing the evidence in the light most favorable to the state, we conclude that the evidence is sufficient to support the jury's finding the defendant guilty beyond a reasonable doubt of two counts of first degree premeditated murder. The defendant used two weapons–scissors and a ligature–on unarmed victims. According to the evidence presented at trial, he inflicted multiple wounds to each victim during a very brutal attack. The evidence shows that he attempted to dispose of evidence of the murders by flushing his underwear down the toilet. The defendant was calm after the murders as he showered, changed his clothes, went through the McBride residence in search of valuables, washed his socks out in the sink, and flushed his underwear down the toilet. Moreover, after the murders, the defendant drove to Missouri where he visited relatives and "partied" with friends. Joseph Walker testified that the defendant told him that he committed the murders and explained that it was his fantasy to go on a rape and murder spree. Based on the foregoing, the evidence is sufficient to support the jury's verdict of first degree premeditated murder.

Next, the defendant asserts that the evidence is insufficient to support the jury's verdict that the murders were committed in furtherance of a robbery. Felony murder is a "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). The "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999). Intent to commit the felony at the time of a murder may be inferred "from a defendant's actions immediately after a killing." Id. at 108.

With respect to the evidence in this case, the defendant had committed an assault before the murders and robbery at issue. He testified that he was scared he was going to be caught by the police and had, in fact, seen a police officer immediately before arriving at the McBride residence. The defendant wanted to flee the area, but he had no money or transportation. He testified that he attempted to call his sister, but she did not answer. After murdering Ms. Poteet and Ms. McBride, he stole money and a pickup truck and was then able to flee to Missouri. Viewing the evidence in the light most favorable to the state, we conclude that the evidence is sufficient to support the jury's finding the defendant guilty beyond a reasonable doubt of murder in the furtherance of a robbery.

## II. PHOTOGRAPHIC EVIDENCE

The defendant contends that the trial court abused its discretion in admitting three photographs of the deceased victims. The photographs at issue are Exhibits 6L, which depicts Sarah McBride lying on the bed where her body was found; 6M, which depicts a close-up view of the back of Sarah McBride's head; and 6T, which depicts a close-up view of Jean Poteet's head and back. The defendant claims that the photographic evidence of the crime scene and deceased victims was irrelevant, cumulative, highly prejudicial and erroneously admitted to inflame the passion of the jury. He asserts that oral testimony and diagrams presented by the state adequately conveyed to the jury any relevant aspects of the photographs.

14

The admissibility of relevant photographs of victims and the crime scene is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion. State v. Carruthers, 35 S.W.3d 516, 576-57 (Tenn. 2000), cert. denied 533 U.S. 953 (2001); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); see also State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993), cert. denied 511 U.S. 1046 (1994). As the Supreme Court stated in Carruthers, the modern trend is to vest more discretion in the trial judge's rulings on admissibility. Carruthers, 35 S.W.3d at 577 (citing Banks, 564 S.W.2d at 949).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. Carruthers, 35 S.W.3d at 577 (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The court must still determine the relevance of the visual evidence and weigh its probative value against any undue prejudice. Id. The term "undue prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 950 (quoting Fed. R. Evid. 403, explanatory note).

In Banks, the supreme court gave the trial courts guidance for determining the admissibility of relevant photographic evidence. A trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions. Id. at 951. In the present case, all of the photographs at issue are accurate and clear, and they have significant evidentiary value. The photographs, especially 6L, accurately depict the bodies as they were found. Moreover, because the defendant was charged with first degree murder and aggravated rape, the state had to prove the elements of those offenses. With regard to the charge of first degree murder, the element of intent may be inferred from the manner and extent of the attack on the victim, see id. at 950, which is portrayed in the photographs. Testimonial evidence alone was insufficient in this case to explain the crime scene and the extent of the attacks on the victims.

The defendant argues that the photographs were cumulative to Dr. Levy's testimony and, therefore, should have been excluded under Rule 403, Tenn. R. Evid. This court has held that photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used. Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973). In the present case, the photographs were used to illustrate the nature of the crime scene, the positions of the victims' bodies, and the cause of death during Dr. Levy's testimony. The photographs were not cumulative to Dr. Levy's testimony.

15

The defendant also argues that because he did not seek to contest the extent of the victims' injuries described by Dr. Levy, the photographs should have been excluded. While it may be true that the defendant did not contest the extent of the victims' injuries, he did contest the fact the murders were committed with intent and premeditation.

The trial court, after a hearing, allowed the photographs at issue to be introduced as evidence. The trial court found that the state could introduce the photographs to prove the elements of the offenses and further found that the probative value of the photographs was not outweighed by the danger of unfair prejudice. We conclude that the trial court did not abuse its discretion in this regard.

### III. VIDEOTAPE OF CRIME SCENE

In addition to challenging the admission of the three photographs at trial, the defendant contends that the trial court committed reversible error by allowing the introduction of a videotape of the crime scene. The defendant basically advances the same arguments with respect to this issue as he did with the challenged photographs: the probative value of the videotape was outweighed by the danger of unfair prejudice and it was cumulative of other evidence.

The admissibility of videotapes of crime scenes is governed by the same standards as that of photographs. After a review of the videotape, we do not believe that its potential for prejudice outweighs its probative value. The videotape is of short duration. It does not focus on the bodies of the victims. Instead, it goes through each room of the residence and portrays the crime scene. The use of the videotape was used by the state to establish the elements of intent and premeditation for the charge of first degree murder. Moreover, the videotape was used by the state to establish the elements of especially aggravated robbery. The admission of the videotape was used to establish the elements of the crimes charged, as allowed by Banks and its progeny. See Banks, 564 S.W.2d at 950.

Further, the defendant contends that the videotape was cumulative of the testimonial evidence, a diagram of the crime scene, and the photographs entered into evidence. While the videotape and the other evidence admitted in this case may have contained some of the same material, it was not error to admit the videotape. See Bigbee, 885 S.W.2d at 807 (holding that it was not error to admit a videotape of the crime scene although it depicted images similar to those of photographs also admitted). Each of the different forms of evidence admitted in this case served different purposes and were probative of the issues to be decided by the jury. We conclude that the trial court did not abuse its discretion in admitting the videotape into evidence. See id.; see also State v. Kelvin Anthony Lee, No. 02C01-9603-CC-00085, Lauderdale County, slip op. at 15 (Tenn. Crim. App. Nov. 5, 1997), app. denied (Tenn. Aug. 3, 1998).

Finally, the defendant argues that the videotape had limited probative value in this case because he did not contest the manner of the victims' deaths nor his identity as the perpetrator. Although the defendant did not challenge these two aspects of the case, he did challenge the

elements of the crimes for which he had been charged. As set forth above, the videotape was relevant and was used to establish the elements of the crimes for which he was charged.

## IV. EVIDENCE TO DISCREDIT TESTIMONY OF JOSEPH WALKER

The defendant contends that the trial court erred in excluding the testimony of Joseph Mount to discredit the testimony of the state's witness, Joseph Walker. The defense requested that it be allowed to introduce the testimony of Joseph Mount to impeach Joseph Walker's testimony that he did not make misrepresentations to mental health professionals during a psychiatric evaluation. The state agreed that the defense could inquire into the matters sought during cross-examination of Mr. Walker, but it objected to defense counsel calling witnesses to introduce extrinsic evidence of the alleged misrepresentations. The trial court ruled that the defense could impeach Mr. Walker during cross-examination related to these matters, but after a jury-out hearing, the trial court held that the defense could not call Mount as a witness. The trial court found Mount's proffered testimony to be inadmissible pursuant to Tenn. R. Evid. 608(b) and Tenn. R. Evid. 403.

Rule 608(b), Tenn. R. Evid. governs admissibility of specific instances of conduct to attack or support a witness's credibility. It provides that specific instances of conduct may not be proven by extrinsic evidence. The defendant does not contend on appeal that the trial court erred in failing to allow the evidence to be admitted pursuant to Rule 608(b). Instead, the defendant asserts that Mount's testimony was admissible under Rules 613 and 616, Tenn. R. Evid.

The state argues that the defendant has waived his right to make the argument on appeal that the testimony should have been admitted pursuant to Rules 613 and 616 because he raises those theories for the first time on appeal. At trial, the defendant argued that Mount's testimony was admissible as evidence of prior bad acts under Rule 608. The defendant also argued that the jury was entitled to know Walker had been diagnosed as someone who had attempted to manipulate the evaluation process, that the issue was one of credibility--not a 608 issue, and that the issue was about the right to put on a defense. In his motion for a new trial, the defendant argued that the failure to allow Mount to testify denied him his rights to confrontation, to a fair trial, and to due process, in violation of the United States and Tennessee Constitutions.

The state responds that the exclusion of Mount's testimony was proper under Rules 613, 616, and 403, Tenn. R. Evid. Rule 616 allows a party to "offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." After a review of the proffered testimony of Mr. Mount, we believe that the evidence failed to establish a bias against the defendant. Therefore, the testimony was not admissible pursuant to Rule 616.

The state acknowledges that Rule 613, Tenn. R. Evid., authorizes the admission of prior inconsistent statements to impeach the credibility of a witness, but argues that the impeachment by extrinsic evidence contemplated by Rule 613 must relate to facts relevant to a material issue at trial. The state further contends that the collateral fact rule applies to this situation. The state cites to this

court's holding in State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992), app. denied (Tenn. 1993), that the collateral fact rule is still viable, although not mentioned in the rules of evidence. The defendant argues that Rule 613(b) sets forth the proper procedure to determine whether extrinsic evidence should be admitted to prove a prior inconsistent statement. He asserts that extrinsic evidence of a witness's prior inconsistent statement is admissible if the witness is confronted with the prior inconsistent statement and either denies or equivocates as to having made the statement. He cites State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998), in support of his position.

Perkinson dealt with the issue of whether the collateral fact rule was applicable to Tenn. R. Evid. 607. Further, Martin did not involve extrinsic evidence of a collateral issue, but rather involved an issue being litigated therein. See Martin, 964 S.W.2d at 568. Therefore, neither party has cited to case law directly on point. As this court noted in Perkinson, however, "[the] collateral attack rule is designed to save time and confusion over the real issues," a rule similar in purpose to Rule 403, Tenn. R. Evid. Perkinson, 867 S.W.2d at 7 (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 607.3 (2d ed. 1990)).

Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The trial court found that the probative value of Joseph Mount's testimony was clearly outweighed by the danger that his testimony would confuse the issues, mislead the jury, and cause undue delay. The defendant asserts that because Walker is the only witness who testified that the defendant knew what happened with regard to the murders, there was a substantial need to impeach his testimony.

Relative to weighing probative value against prejudice or the potential for prejudice, the admissibility of evidence is a matter which rests within the discretion of the trial court. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). We will not reverse the trial court's decision on the admissibility of evidence absent abuse of that discretion.

The defendant was given the opportunity to cross-examine Walker on the matters at issue. After reviewing the evidence, we conclude that the trial court did not abuse its discretion in excluding the testimony of Joseph Mount. The introduction of Mount's testimony would have resulted in a mini-trial concerning Mr. Walker's actions during a psychiatric evaluation, and the testimony would potentially have confused the issues of the defendant's capital murder trial.

## V. SPECIAL JURY INSTRUCTION THAT ALL HOMICIDES ARE PRESUMED TO BE SECOND DEGREE MURDER

The defendant filed a motion requesting a special instruction to the jury that all homicides are presumed to be second degree murder. The instruction stated:

18

> Once a homicide has been established, it is presumed to be murder in the second degree, and the state bears the burden of proof on the issue of premeditation sufficient to elevate the offense to first degree murder.

The trial court denied the defendant's request and instructed the jury on first degree murder as provided in T.P.I. § 7.01(b) (6th ed. 2001).

A defendant has a constitutional right to a complete and correct charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), cert. denied 498 U.S. 1007 (1990). However, a trial court is not required to give a requested instruction if the substance of the instruction is covered in the general charge. State v. Zirkle, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995). In ruling on a similar request for a jury instruction on the presumption of second degree murder, this court has previously stated:

> [W]e acknowledge our supreme court's observation in State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992), that "[t]he law in Tennessee has long recognized that once [a] homicide has been established, it is presumed to be murder in the second degree." However, the import of this presumption is that "[t]he state bears the burden of proof on the issue of premeditation . . . sufficient to elevate the offense to first-degree murder." Therefore, when a trial court's charge omits the language of "presumption" but otherwise clearly informs the jury that the State carries the burden of proving each and every element of first degree premeditated murder beyond a reasonable doubt and also includes a correct and complete instruction on second degree murder, a criminal defendant is not entitled to relief.

State v. Coulter, 67 S.W.3d 3, 68 (Tenn. Crim. App. 2001) (citations omitted).

In the present case, the trial court fully, fairly, and accurately instructed the jury on the law. The pattern jury instruction informed the jury that the state carried the burden of proving the elements of first degree premeditated murder beyond a reasonable doubt. The defendant is not entitled to relief on this issue.

## VI. TESTIMONY OF DORIANNE BROWN FOR CONTEXTUAL BACKGROUND

The defendant asserts that the trial court committed reversible error by instructing the jury that they could consider the evidence related to other crimes to "complete the story of the crime." The instruction also provided that the jury could not consider evidence of another crime to prove the defendant's disposition to commit the crime on trial.

The defendant contends that the court's instruction allowing the jury to consider the assault on Dorainne Brown for the purpose of completing the story of the murders was reversible error because such evidence was only admissible to show the defendant's motive. The defendant does not advance the argument on appeal that the evidence of the assault should have been excluded. In fact, he concedes that the evidence was relevant to show motive. However, he contends that the jury could have concluded from the instruction that it could consider the defendant's attack upon Ms. Brown as evidence that he planned to commit the attacks upon Ms. McBride and Ms. Poteet.

The specific instruction the trial court gave was as follows:

> If from the proof you find that the defendant has committed a crime other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial.
>
> This evidence may only be considered by you for the limited purpose of determining whether it provides:
>
>> (a) the complete story of the crime; that is, such evidence may be considered by you where the prior crime and the present alleged crime are logically related or connected, so that proof of the other tends, or is necessary to prove the one charged, or is necessary for a complete account thereof;

(b) the motive, that is such evidence may be considered by you if it tends to show a motive of the defendant for the commission of the offense presently charged.

> Such evidence of the other crime, if considered by you for any purpose, must not be considered for any purpose other than that specifically stated.

The supreme court set forth the analysis to be followed when determining whether evidence of other crimes may be admitted to show contextual background in State v. Gilliland, 22 S.W.3d 266 (Tenn. 2000). It specifically ruled that contextual background evidence may be admitted "when exclusion of that evidence would create a chronological or conceptual void in the presentation of the case and that void would likely result in significant jury confusion concerning the material issues or evidence in the case." Id. at 272. The court cautioned that "[a] careful balance must be maintained so as not to allow background evidence to rupture the general prohibition against evidence offered only to show criminal propensity." Id. at 271. The court then clarified its holding by stating that "when the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's

20

presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice." Id. at 272 (emphasis added).

In the present case, the trial court did not hold a jury-out hearing to determine if the evidence of the attack on Dorianne Brown was admissible under the factors set forth in Gilliland. The evidence was admitted, and the jury was later instructed as noted. Moreover, in its order denying the defendant's motion for new trial, the court stated:

> After considering the circumstances of the motel incident as well as the parties' theories regarding its relevance to the subsequent murders, the Court finds that the absence of the evidence would have created a chronological or conceptual void in the presentation of the case, and the void likely would have resulted in significant jury confusion as to material issues or evidence in the case. Moreover, the Court concludes that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

The trial court did not follow the guidelines set forth in Gilliland. It admitted the evidence without making the appropriate determinations under Gilliland and later made a cursory statement in the order denying the motion for new trial that the evidence was proper as contextual background evidence under Gilliland. We, however, conclude otherwise.

The evidence surrounding an attack on Dorianne Brown by the defendant the night before the murders was not needed to explain the murders of Ms. McBride and Ms. Poteet. This evidence did not "complete the story" as argued by the state. When viewed in light of all the other evidence presented at the trial, it is highly unlikely that any conceptual void created by the absence of the attack on Ms. Brown would have impaired the jury's understanding of the material issues. Therefore, we hold that it was error for the court to have admitted the evidence of the attack on Dorianne Brown for the purpose of contextual background.

Nevertheless, we conclude that the error in admitting this evidence for the purpose of contextual background was harmless, because the evidence was admissible for the purpose of proving motive under Rule 404(b), Tenn. R. Evid. At trial, the state argued that the evidence of the attack on Ms. Brown was needed to prove the defendant's motive in killing Ms. Poteet and Ms. McBride. The defense has not alleged, either at trial or on appeal, that the admission of the evidence at issue was improper for the purpose of proving motive. Thus, although the trial court improperly instructed the jury that they could consider the evidence of the attack on Ms. Brown for contextual background purposes, the evidence was properly admitted for the purpose of proving the defendant's motive. After reviewing the record, we cannot conclude that the admission of the evidence for the purpose of contextual background more probably more than not affected the verdict. See T.R.A.P.

36(b).  The evidence of the attack on Dorianne Brown was minimal in proportion to the other evidence presented.   Therefore, the error was harmless.

## VII.  VICTIM IMPACT EVIDENCE

The defendant contends that the trial court erred by allowing the admission of victim impact evidence at the penalty phase of the trial.  Specifically, he urges us to find that the introduction of victim impact testimony violated his right to due process under the Tennessee and United States Constitutions and his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.  Further, the defendant argues that victim impact testimony is irrelevant under the capital sentencing structure established by Tenn. Code Ann. § 39-13-204(g)(1) and State v. Nesbit, 978 S.W.2d 872, 892 (Tenn. 1998), cert. denied 526 U.S. 1052 (1999), and should be excluded.  Specifically, he asserts that Tenn. Code Ann. § 39-13-204(g)(1) directs that once a jury decides that  aggravating circumstances exist, and they outweigh any mitigating circumstances, the jury "shall" return a verdict of death.  He asserts that under Nesbit, the jury is not permitted to consider the victim impact evidence until after finding at least one aggravating circumstance exists and that the aggravating circumstance(s) outweigh any mitigating circumstances beyond a reasonable doubt.  Therefore, the defendant claims that by the time the jury can properly consider victim impact testimony, the jury has lost its discretion in sentencing the defendant.  Accordingly, the defendant contends that victim impact testimony has no role under the current capital sentencing structure and should be excluded.

Victim impact evidence has been declared constitutional by the United States Supreme Court and the Tennessee Supreme Court.  Payne v. Tennessee, 501 U.S. 808, 827 (1991); Nesbit, 978 S.W.2d at 889.  We note that the victim impact testimony in this case was brief, consisting of three witnesses; unemotional; limited to providing a brief glimpse into the lives of victims Sarah McBride and Jean Poteet; and limited by explaining the emotional, psychological, and physical impact of the victims' deaths on their families.

Furthermore, the argument advanced by the defendant that victim impact testimony is irrelevant and should be excluded under Tennessee's current capital sentencing system, has been rejected by the supreme court.  See State v. Reid, 91 S.W.3d 247, 282-83 (Tenn. 2002) (holding that any contradiction between the statute and the Nesbit instruction inures to the benefit of the defendant). We conclude that this issue is without merit.

## VIII.  LIFE PHOTOGRAPHS OF VICTIMS

The defendant challenges the introduction of photographs of the victims before they were murdered during the victim impact testimony. He asserts that the photographs were irrelevant and, in the alternative, asserts that their probative value was outweighed by their prejudicial effect.  The state counters that the photographs were relevant to provide a brief glimpse into the lives of the victims, as victim impact testimony is designed to do.  See Nesbit, 978 S.W.2d at 889.  The defendant cites State v. Dicks, 615 S.W.2d 126, 128 (Tenn. 1981), cert. denied 454 U.S. 933 (1981).

However, in <u>Nesbit</u>, 978 S.W.2d at 901-02, the supreme court adopted that portion of this court's opinion which held that a photograph of the victim while alive was relevant to the state's case in chief in proving that the person murdered was the same person named in the indictment. Based on this holding, the supreme court allowed the introduction of life photographs in <u>Carruthers</u>, 35 S.W.3d at 578. Moreover, the photographs did nothing more than provide a glimpse into the lives of the victims, as allowed under <u>Nesbit</u>, 978 S.W.2d at 889. We conclude that the defendant is not entitled to relief on this issue.

## IX.  TESTIMONY OF DR. LEVY AND AUTOPSY PHOTOGRAPHS
## AT PENALTY PHASE

The defendant contends that the trial court erred by allowing Dr. Levy to testify during the penalty phase of the trial and by allowing the introduction of autopsy photographs during Dr. Levy's testimony. The defendant argues that Dr. Levy's testimony and the photographs should have been excluded pursuant to Tennessee Rule of Evidence 403, as the evidence was cumulative and unfairly prejudicial. In this respect, he asserts that the testimony had little probative value at the penalty phase because Dr. Levy's penalty phase testimony basically echoed his previous testimony.

The state responds that the testimony of Dr. Levy and the autopsy photographs were needed at the penalty phase to prove the existence of the aggravating circumstance that the murders were "especially heinous, atrocious, or cruel in that [they] involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). In his testimony, Dr. Levy described the nature and extent of the injuries sustained by the victims before their respective deaths. This testimony was relevant and highly probative of the existence of torture and serious physical abuse, necessary elements of the "especially heinous, atrocious or cruel" aggravating circumstance. As the state asserts, although the autopsy photographs may have been unpleasant, they were illustrative of Dr. Levy's testimony and highly relevant to the extent of abuse endured by the victims. Moreover, in a capital sentencing hearing, evidence that has "probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence." Tenn. Code Ann. § 39-13-204(c); <u>see</u> <u>State v. Hall</u>, 8 S.W.3d 593, 602 (Tenn. 1999), <u>cert. denied</u> 531 U.S. 837 (2000) (holding that autopsy photographs were admissible in a capital sentencing hearing under the sentencing statute notwithstanding Rules 401 and 403 of the Tennessee Rules of Evidence). We conclude that the trial court did not abuse its discretion in allowing Dr. Levy to testify at the sentencing hearing or in allowing the introduction of the autopsy photographs.

## X.  CONSTITUTIONALITY OF THE TENNESSEE DEATH PENALTY STATUTE

The defendant asserts that the trial court erred in failing to declare Tennessee's death penalty statute unconstitutional. All of the objections to the constitutionality of the death penalty statute that the defendant has asserted have been repeatedly rejected by the Tennessee Supreme Court. <u>See</u> <u>Terry v. State</u>, 46 S.W.3d 147, 169-71 (Tenn. 2001), <u>cert. denied</u> 534 U.S. 1023 (2001). This issue is without merit.

## XI.  USE OF "RELIGIOUS TESTS" DURING VOIR DIRE

The defendant contends that the removal for cause of those jurors who could not commit to the imposition of the death penalty based upon religious, moral or philosophical views violates article I, section 6 of the Tennessee Constitution.  The supreme court affirmed this court's holding in State v. Reid, that the exclusion of prospective jurors by a trial court because of their moral or religious based reluctance to impose the death is not error.  91 S.W.3d at 289-90.  "In this regard, potential jurors are removed for cause not because of their religious opinion or affiliation but because the jurors are unable to view the proceedings impartially and perform their duties in accordance with the juror's oath."  Id. at 290.  Questioning of a juror with regard to the death penalty does not amount to a religious test.  Id. (citing Wolf v. Sundquist, 955 S.W.2d 626, 631 (Tenn. Ct. App. 1997), app. denied (Tenn. 1997)).  The defendant is not entitled to relief on this issue.

## XII.  USE OF THE FELONY MURDER AGGRAVATING CIRCUMSTANCE

The defendant argues that the trial court should not have allowed the state to pursue the death penalty based upon the felony murder aggravating circumstance because he was convicted of felony murder.  The felony murder aggravating circumstance may be relied upon by the prosecution in seeking a death sentence when the defendant is found guilty of both premeditated murder and murder in the perpetration of a robbery, and the trial court merges the dual convictions into one conviction of first degree murder.  See, e.g., Reid, 91 S.W.3d at 306; Carter v. State, 958 S.W.2d 620, 624 (Tenn. 1997).  The defendant recognizes that other cases have upheld this practice by merging the premeditated and felony murder convictions.  However, he claims the practice "violates the principles of death-sentencing as outlined by the Tennessee Supreme Court in Middlebrooks."  He also recognizes that the language of the (i)(7) aggravating circumstance has been amended by adding the "knowing" element.  He simply requests that we adopt a position contrary to that currently held by the courts of this state.  This we may not do.

## XIII.  USE OF THE HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATING CIRCUMSTANCE

The defendant also contends that the state should have been prohibited from using the "heinous, atrocious or cruel" statutory aggravating circumstance.  He argues that the language of the aggravating circumstance is "overly broad and fails to sufficiently channel the jury's discretion and meaningfully narrow the class of death penalty eligible defendants."  The Tennessee Supreme Court has consistently upheld the constitutionality of the "heinous, atrocious or cruel" statutory aggravating circumstance.  See Terry v. State, 46 S.W.3d 147 (Tenn. 2001), cert. denied 534 U.S. 1023 (2001); State v. Middlebrooks, 995 S.W.2d 550, 555-56 (Tenn. 1999); State v. Blanton, 975 S.W.2d 269, 280 (Tenn. 1998), cert. denied 525 U.S. 1180 (1999).  Moreover, the supreme court has defined each term according to its ordinary and natural meaning.  See State v. Williams, 690 S.W.2d 517, 527-30 (Tenn. 1985).  The trial court instructed the jury with the verbatim definitions prescribed by the supreme court for the terms heinous, atrocious and cruel.  Accordingly, the use of the aggravating factor was proper.

24

## XIV.  MOTION TO STRIKE NOTICE OF INTENT TO SEEK DEATH PENALTY PURSUANT TO <u>APPRENDI V. NEW JERSEY</u>

The defendant contends that the trial court improperly denied his motion to strike the death penalty notice.  He asserts that <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348 (2000), and Tennessee Rule of Criminal Procedure 12.3(b) require the grand jury to find the existence of one or more statutory aggravating circumstances under Tenn. Code Ann.§ 39-13-204(i).  However, the Tennessee Supreme Court has rejected this argument and found that <u>Apprendi</u> is not implicated in capital case procedure in Tennessee.  <u>State v. Dellinger</u>, 79 S.W.3d 458, 466-67 (Tenn. 2002), <u>cert. denied</u> ___ U.S. ___, 123  S. Ct. 695 (2002).  We conclude that no error occurred.

## XV.  PROPORTIONALITY REVIEW

Finally, the defendant contends that the sentence of death in his case is disproportionate to the sentences imposed in similar cases because of his substantial mitigation proof.  In reviewing a defendant's sentence of death for first degree murder, "the reviewing courts shall determine whether . . . [the] sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant."  Tenn. Code Ann. § 39-13-206(c)(1)(D).

The supreme court has explained comparative proportionality review as follows:

> In conducting a comparative proportionality review, we begin with
>
> the presumption that the sentence of death is proportional with the crime of first degree murder. <u>State v. Hall</u>, 958 S.W.2d 679 (Tenn. 1997). A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." <u>Id.</u> <u>citing</u> <u>State v. Ramsey</u>, 864 S.W.2d 320, 328 (Mo. 1993). A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. <u>State v. Bland</u>, 958 S.W.2d 651 (Tenn. 1997) (citing <u>State v. Carter</u>, 714 S.W.2d 241, 251 (Tenn. 1986)). Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics."  <u>Bland</u>, 958 S.W.2d at 665. Our duty "is to assure that no aberrant death sentence is affirmed." <u>Id.</u> (citing <u>State v. Webb</u>, 238 Conn. 389, 680 A.2d 147, 203 (Conn. 1996)).
>
> Our proportionality review is neither a rigid nor an objective  test. <u>Hall</u>, 958 S.W.2d at 699. There is no "mathematical formula or scientific grid," and we are not bound to consider only cases in which the same aggravating circumstances were found applicable by a jury. <u>Id.</u>; <u>State v. Brimmer</u>, 876 S.W.2d 75, 84 (Tenn. 1994). This Court

considers many variables when choosing and comparing cases. Bland, 958 S.W.2d at 667. Among these variables are: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. Id.; Hall, 958 S.W.2d at 699. Factors considered when comparing characteristics of defendants include: (1) the defendants' prior criminal record or prior criminal activity; (2) the defendants' age, race, and gender; (3) the defendants' mental, emotional or physical condition; (4) the defendants' involvement or role in the murder; (5) the defendants' cooperation with authorities; (6) the defendants' remorse; (7) the defendants' knowledge of helplessness of victim(s); and (8) the defendants' capacity for rehabilitation. Id.

State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998).

We have compared the circumstances of the present case with the circumstances of similar cases and conclude that the sentence of death in this case is proportionate to the sentences imposed in similar cases. See e.g., State v. Bush, 942 S.W.2d 489 (Tenn. 1997) (imposing the death penalty when the defendant murdered a seventy-nine-year-old widow upon finding aggravating circumstance (i)(5), despite substantial mitigation proof); State v. Smith, 893 S.W.2d 908 (Tenn. 1994) (imposing the death penalty when a forty-one-year-old defendant murdered and raped an elderly widow upon finding aggravating circumstances (i)(2), (i)(5), and (i)(7); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994) (imposing the death penalty when a twenty-seven-year-old defendant murdered and raped a helpless elderly woman upon finding aggravating circumstances (i)(2), (i)(5), and (i)(7)); State v. Barber, 753 S.W.2d 659 (Tenn. 1988) (imposing the death penalty when a twenty-nine-year-old defendant murdered an elderly woman upon finding aggravating circumstance (i)(5)); State v. McNish, 727 S.W.2d 490 (Tenn. 1987) (imposing the death penalty for the murder of a seventy-two-year-old widow upon finding aggravating circumstance (i)(5)); State v. Harbison, 704 S.W.2d 314 (Tenn. 1986) (imposing the death sentence for the murder of a sixty-two-year-old woman upon finding aggravating circumstance (i)(7); State v. Cone, 665 S.W.2d 87 (Tenn. 1984) (imposing the death penalty where the defendant murdered an elderly couple upon finding aggravating circumstances (i)(5) and (i)(7); and State v. Mann, 959 S.W.2d 503, 513-16 (Tenn. 1997) (imposing the death penalty where the defendant murdered a sixty-two-year-old widow who was hearing impaired upon finding aggravating circumstances (i)(5) and (i)(7)). Unquestionably, the defendant's evidence of his background reflects tragedy upon tragedy. However, after reviewing the evidence and the cited cases, as well as cases not cited, we cannot conclude that the penalty imposed by the jury in this case is disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

Pursuant to Tenn. Code Ann. § 39-13-206(c)(1)(A-D), we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that the sentence is not disproportionate. We have also reviewed all issues raised by the defendant and have found no reversible error. However, we note that the judgment referring to Count 5 is actually for the aggravated rape conviction in Count 6 and that the judgment referring to Count 6 is actually for the especially aggravated robbery conviction in Count 5. The case should be remanded in order that the trial court may correct these clerical errors. In all other respects, the judgments of conviction are affirmed.

_____
JOSEPH M. TIPTON, JUDGE

27